SCHAFER et al., Appellees and Cross–Appellants,

v.

RMS REALTY et al., Appellants and Cross–Appellees.

[Cite as *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 17673.

Decided June 23, 2000.

*Neil F. Freund* and *Wayne E. Waite,* for appellee and cross–appellant Everett Schafer.

*Robert A. Pitcairn, Jr.,* for appellant RMS Realty.

*James M. Hill,* for individual defendants-appellants.

BROGAN, Judge.

In this case, defendants, RMS Realty ("RMS"), seven partners in RMS, and the managing agent of RMS, appeal from a jury verdict in favor of a minority partner, Everett Schafer. Additionally, Schafer cross-appeals from certain decisions in the trial court.

Schafer's action against the defendants is based on an alleged wrongful capital call by the majority partners of RMS. The capital call was issued to reimburse Sun T.V. (Sun) in the amount of $2,000,000 for a building constructed by Sun on land owned by RMS. At the time of the capital call, Schafer owned a twenty-five percent interest in RMS, and was, therefore, required to contribute $500,000. However, Schafer could not raise that amount of money and the other partners contributed his share. This, in turn, activated a provision in the partnership agreement that diluted the interest of any partner who did not meet a capital call. As a result, Schafer's interest in RMS was reduced by about nineteen percent.

The dilution occurred on May 3, 1995. Subsequently, on September 19, 1995, Schafer and his wife filed a complaint against RMS, the seven other partners in RMS, and the agent/trustee of RMS. In the complaint, Schafer included claims for dissolution and an accounting, breach of contract, promissory estoppel, quantum meruit, conversion, breach of fiduciary duty, fraud, negligence and intentional infliction of emotional distress, and a real estate commission. Before trial, the court granted summary judgment against the Schafers on all claims except conversion, breach of fiduciary duty, and the real estate commission. The case was then tried before a jury for two weeks, beginning on July 14, 1997. At the end of the trial, the court let the jury consider the conversion claim, including damages, with regard to the individual defendants. The court also allowed the jury to consider breach of fiduciary duty claims against the individual defendants and RMS, but did not let the jury decide the damages, if any, resulting from the breach. Additionally, the jury was allowed to decide the issue of the real estate commission.

The jury found in Schafer's favor on the conversion claim and awarded $695,400 in damages. Likewise, the jury found for Schafer on the breach of fiduciary duty claim against both RMS and the individual defendants. Interrogatories were given to the jury concerning these claims, and the jury made several findings. Specifically, the jury found that the individual defendants converted nineteen percent of Schafer's partnership property interest, that the conversion was the proximate cause of damage to Schafer, and that the amount of damages was $695,400. The jury further found that both the individual defendants and RMS breached their fiduciary duty to Schafer and that Schafer was entitled to an accounting. In this regard, the jury said the breach of fiduciary duty occurred due to the wrongful capital call and to a failure to disclose information. The jury did find against Schafer on his claim for a $50,000 real estate commission in connection with the Sun transaction.

In the complaint, Schafer had asked for punitive damages and attorney fees both on the conversion claim and on the breach of fiduciary duty (accounting) claim. At trial, the court rejected punitive damages as a remedy for breach of

fiduciary duty but did agree that punitive damages could be recovered on the conversion claim. However, the jury chose not to award punitive damages, and the issue of attorney fees was, therefore, not considered.

After the trial, Schafer filed a motion under R.C. 1775.36 for authority to wind up the partnership. Additionally, Schafer filed a motion for prejudgment interest and a motion for dissolution pursuant to R.C. 1775.31. At that point, the court referred the case to a magistrate. Following the referral, the defendants filed motions for judgment notwithstanding the verdict and for new trial. The magistrate then scheduled hearings on prejudgment interest and accounting/dissolution. Before the hearings took place, the trial judge overruled the defendants' motions for judgment notwithstanding the verdict and new trial. Subsequently, the magistrate held hearings on prejudgment interest and accounting/dissolution on May 26 and 27, 1998, and on June 3, 1998.

Ultimately, in a decision filed on November 20, 1998, the magistrate rejected prejudgment interest because "both parties lacked the compromising spirit necessary for effective negotiations." Concerning dissolution, the magistrate found that Schafer had presented evidence in support of three separate statutory grounds for dissolution: R.C. 1775.31(A)(3), (4), and (6). However, the magistrate also concluded that the evidence on the three factors was not sufficient to justify dissolution. In particular, the magistrate focused on the fact that the defendants' breaches of fiduciary duty did not prejudicially affect the partnership business. Instead, the business itself enjoyed continued success.

As a final matter, the magistrate rejected the plaintiff's "motion for an accounting." In this regard, the magistrate relied on the fact that the jury award had already compensated Schafer for the value of the nineteen percent interest he had lost. Furthermore, no real dispute existed about the fact that Schafer had received and had continued to receive the appropriate profits from his remaining six percent partnership interest. Accordingly, the magistrate decided that an accounting to see if Schafer was entitled to additional damages was unnecessary.

After Schafer objected to the magistrate's decision, the trial court adopted the decision on February 5, 1999. This appeal and cross-appeal then followed.

On appeal, RMS presents three assignments of error, the individual defendants assert ten assignments of error, and the cross appeal contains six assignments of error. Some assignments of error address pretrial rulings, some cover the trial proceedings, and some relate to post-trial decisions. In addition, some assignments of error overlap. As a result, we will consider assignments of error together, where appropriate. We will also include factual discussion relevant to the particular error being discussed.

## I. Effect of the Partnership Agreement

In the first assignment of error, RMS contends that the trial court erred in refusing to direct a verdict in its favor. Primarily, RMS argues that partners cannot breach a fiduciary duty by voting in favor of action specifically authorized by the partnership agreement. The action in question was a capital call in the amount of $2,000,000, which RMS used to reimburse Sun under a "build-to-suit" agreement. RMS also focuses on this point (among others) in the second assignment of error, which raises trial court error in failing to grant the RMS motion for judgment notwithstanding the verdict. Essentially, RMS contends in these assignments of error that a partner is precluded as a matter of law from maintaining an action for breach of fiduciary duty if the conduct in question, no matter how wrongful, is authorized by a partnership agreement.

Finally, RMS argues in its third assignment of error that the jury verdict on breach of fiduciary duty was against the manifest weight of the evidence. In this regard, RMS claims that even if Schafer could maintain an action for breach of fiduciary duty, no evidence was presented which would allow a jury to rationally find that the capital call was wrongful.

The eight individual defendants rely on a similar legal argument to support their first assignment of error (labeled "A"), which attacks the trial court's failure to grant them a directed verdict and judgment notwithstanding the verdict. The controlling effect of the partnership agreement is also a predicate for the individual defendants' argument in their second assignment of error ("B") that the jury verdict for breach of fiduciary duty is against the manifest weight of the evidence. Alternatively, the individual defendants claim in this assignment of error that the evidence at trial overwhelmingly shows their actions were taken for legitimate reasons.

Due to the overlap of these issues, our discussion here will resolve the first and third assignments of error of RMS and will impact its second assignment of error as well. Likewise, our analysis will resolve assignments of error "A" and "B" of the individual defendants.

We begin by noting the standards for directed verdicts and judgment notwithstanding the verdict. Motions for directed verdict test the legal sufficiency of evidence, not its weight or the credibility of witnesses. As a result, our review of the lower court judgment is *de novo*. *Nichols v. Hanzel* (1996), 110 Ohio App.3d 591, 599, 674 N.E.2d 1237, 1242. Further, in evaluating whether directed verdicts are merited, courts decide if " 'there exists any evidence of substantial probative value in support of [the claims of the party against whom the motion is directed]. * * * A motion for a directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the

conclusions to be drawn from the evidence.'" *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119–120, 671 N.E.2d 252, 255–256. The same tests are applied in reviewing decisions on motions for judgment notwithstanding the verdict. *Posin v. A.B.C. Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 427–428, 344 N.E.2d 334, 339. Therefore, our first task is to decide if Schafer is barred as a matter of law from bringing a claim for breach of fiduciary duty. If we decide in Schafer's favor on the legal issue, we must then consider if Schafer's claim for breach of fiduciary duty is supported by substantial, probative evidence, upon which reasonable minds can differ. *Wells v. Miami Valley Hosp.* (1993), 90 Ohio App.3d 840, 848, 631 N.E.2d 642, 646–647.

Before we discuss the legal issues, some factual background would be helpful. At trial, the following evidence was presented. In 1986, Everett Schafer, Allan Rinzler, and Jerald Mayerson formed RMS for the purpose of buying a 5.22 acre commercial property known as Mailbu Grand Prix ("Malibu"). At the time, Schafer shared office space with Mayerson, who was a real estate broker. Schafer sold commercial real estate and was mainly involved in land development, while Mayerson focused on his own real estate investments. Rinzler also shared space in the same office suite, and operated Rinzler & Associates, which was an investment company. Rinzler and Mayerson had been partners for many years in a number of other ventures, including the purchase of the building in which their offices were located. Both Rinzler and Mayerson had financial assets substantially exceeding those of Schafer.

Schafer is the one who located the Malibu property. Because Schafer did not have financing available, he approached Mayerson, who then suggested that they talk to Rinzler. As a result of these conversations, RMS was formed. Rinzler drafted the partnership agreement, which was signed on December 19, 1986. Under the agreement, Rinzler and Mayerson were each 37.5 percent partners, and Schafer had a twenty-five percent interest. Since the original purchase price of the Malibu property was $800,000, Schafer was, therefore, responsible for $200,000.

To finance the transaction, the partners signed a note individually and as partners to National City Bank ("NCB") in the amount of $800,000. Rinzler also signed as trustee for RMS. Under the note, the partners and partnership were jointly and severally liable for the full amount of the debt. The note itself was an open-end mortgage and rents were assigned as security. As additional security, the bank obtained personal guarantees from the partners. Of the $800,000 that was available, RMS borrowed $600,000 to fund the purchase. Schafer's twenty-five percent share of this was $150,000. To fund the remaining amount of his obligation, Schafer signed a separate, unsecured note for $50,000, assigning his rights in the partnership as security. At the time the partnership was formed,

the Malibu property generated about $89,000 annual income in rent. Schafer received enough cash from partnership distributions to service his debt on the property.

In 1987, Rinzler transferred all of his partnership interest to his wife, Brenda. Subsequently, in December 1993 and January 1994, Brenda conveyed part of her interest to the couple's sons, Barrett and Harley. At all relevant times, however, Allan Rinzler remained as trustee and continued to manage the property. The testimony at trial clearly indicated that the transfer was in name only and that Allan continued to make all decisions about RMS and to treat the partnership interest as if he were still a partner. In 1993 and 1994, Mayerson also transferred a small part of his interest to his sons, Mark, Michael, and Richard. These eight people were the individual defendants sued by Schafer.

The note for the original loan matured in one year, but was extended. In January 1989, Rinzler wanted to pay off the loan. At that time, Schafer and Mayerson did not have cash available and individually borrowed their shares from NCB. Again, the loans were secured by the partnership property, and both Schafer and Mayerson pledged their interest in RMS as security.

The partnership then continued without incident for several years. From 1989 through 1992, the tenant leasing Malibu was occasionally delinquent in rent. Because the partners felt the tenant would probably not renew its lease option in 1994, they began looking for other users for the property. Schafer was the primary partner involved in exposing the property to potential users.

In late summer or early fall 1993, several prospective tenants looked at the property. In November 1993, the tenant on Malibu was again late with rent and did not cure. As a result, an eviction process was begun. During the same month, Schafer received a letter of intent from Sun, proposing a "build-to-suit" arrangement. Essentially, Sun proposed that it would construct a 50,000 square foot building. In turn, RMS would reimburse Sun a maximum of $2,000,000 for the construction. RMS would then lease the building back to Sun for $500,000 per year for twenty years, with two five-year options.

Schafer's testimony was that financing of partnership matters was discussed both before and after the execution of the partnership agreement. Specifically, the partners discussed further development of the Malibu property, and agreed that they would finance one hundred percent of any transaction. With particular reference to the Sun deal, the partners agreed that the transaction would be financed one hundred percent. According to Schafer, Rinzler ran various "proformas" or financial scenarios before RMS received the letter of intent from Sun. These proformas calculated the mortgage payments, cash flow, taxable income, amount of distributions, and so on, depending on the amount of money borrowed, for loan amounts between $2,000,000 and $2,500,000. The additional amounts

were included because Sun only needed the front four acres of the property and more money would be needed to develop the remaining 1.3 acres.

According to Schafer, the partners agreed that if he located a building or tenant, they would finance the transaction. Absent this agreement, he would not have looked for a tenant because he could not afford to pay cash. By contrast, Rinzler's testimony was that he never agreed to finance all partnership transactions and did not agree to finance the Sun deal in particular.

The partnership agreement itself does not prevent partners from agreeing to finance projects nor does it restrict their ability to use any particular method of financing, so long as the partnership agrees. The agreement does say in Paragraph 4 (Capital Contribution):

"The Partners shall make capital contributions from time to time in such amounts as may be required to carry out the purposes of the Partnership. Each Partner shall contribute in cash a percentage of the total contribution required, equivalent to his percentage interest in the Partnership profits and losses.

"In the event that any Partner is unable to make his required contribution, the necessary funds may be raised by the Partnership from one or more of the remaining Partners. In that event, the capital accounts, as adjusted, shall then be the basis for adjusting the profit and loss percentages in Paragraph 5."

Paragraph 9 of the agreement further states:

"Each Partner shall have a voice in management of the Partnership business. Except as otherwise provided in this Agreement, all decisions relating to the Partnership business shall be made by the affirmative vote of Partners whose share of net profits and net losses totals more than 50%."

Paragraph 11 additionally restricted partners from assigning, mortgaging, pledging, or otherwise encumbering their partnership interests, or from entering into agreements as a result of which any other person or entity might become interested in the partnership or its assets (other than transfers of partnership interests), without the partnership's prior written consent.

On November 29, 1993, RMS sent a letter to Sun, indicating basic acceptance of Sun's proposed terms, with some exceptions. The letter also specifically qualified any obligation upon negotiation of a mutually satisfactory lease agreement. Following this letter, RMS attorneys prepared a number of drafts of a proposed lease agreement between Sun and RMS. Eventually, a contract to lease was used instead and was signed on behalf of RMS on May 20, 1994, by Allan Rinzler (as trustee) and by Brenda Rinzler and Jerald Mayerson (as general partners).

During the time the Sun lease was being negotiated, Rinzler and Schafer had a disagreement about the payment to Schafer of a real estate commission. A draft of the lease agreement generated around December 27, 1993, provided for payment of a $50,000 commission to Mayerson & Associates, *i.e*, the broker through whom Schafer received commissions. The agreement also provided for a comparable commission to Espey and Strauss Realty Co. (Sun's broker). Rinzler's account is that Schafer asked for the commission language to be inserted, essentially behind Rinzler's back. When Rinzler received the December 27, 1993 draft, he called the RMS attorney and told him to remove the Mayerson commission language from the lease agreement. This attorney was unable to say definitively if he prepared another draft, and no such draft was produced by the defense at trial. According to the attorney, a number of changes were taking place at that time and it did not look like the lease would be finalized as soon as they had hoped. As a result, the parties started to move toward an agreement to lease, which was what was eventually used.

Schafer's account is that he was not aware until May 10, 1994, that the commission provision had been removed. On that date, Rinzler called Schafer into his office to discuss how commissions would be paid. Rinzler proposed paying Espey and Strauss over a period of several months rather than in a lump sum. When Schafer asked how his own commission would be paid, Rinzler told him that he would not be paid anything. At that point, Schafer learned that the commission provision had been removed from the lease. According to Schafer, the two men argued about the commission and Rinzler threatened to remove his guarantee for Schafer's current partnership loan. Rinzler also said, "Get your (expletive deleted) mortgage off my property." As Schafer left the office, Rinzler asked Schafer how he was "gonna finance it." Schafer interpreted this as a threat but did not know if Rinzler meant the $100,000 Schafer still owed on the original Malibu purchase or if he was referring to the Sun transaction.

Rinzler's testimony was that he did not threaten Schafer during this meeting. Instead, he merely reminded Schafer that a condition of the Sun lease was that the RMS property be clear of mortgages. In any event, Schafer removed his mortgage from the RMS property on May 20, 1994, by mortgaging another property he owned.

According to Schafer, the agreement up to the May 10, 1994 meeting was that the Sun transaction would be financed. In this regard, Fred Schantz, the NCB president, had written to Sun on May 4, 1994, at Rinzler's request. Rinzler had done business with NCB for many years and was a significant customer. In the letter, Schantz assured Sun that NCB would provide the $2,000,000 for reimbursement to Sun, if the owners of the property required it. Schantz also stated in the letter that "[o]ur loan commitment is subject to normal terms and

conditions." Rinzler testified that this was merely a "comfort letter" to Sun to assure Sun that the partnership was financially sound.

Sun signed the contract to lease on May 9, 1994. As was indicated, the disagreement between Rinzler and Schafer took place on May 10, 1994. Subsequently, on May 23, 1994, Jonas Gruenberg, the partnership attorney, sent a letter to the partners informing them that RMS had received an offer to lease the partnership property and that the proposal required the partnership to reimburse $2,000,000 for construction costs. Gruenberg then stated that "[t]his may require each partner to contribute his or her proportionate share of that amount to the capital of the partnership." According to Schafer, this was the first time a capital call had been mentioned and was also the first "legal document" between the partners. Schafer testified this was the first sign that the other partners were going to try to squeeze him out, as they knew he did not have the cash to contribute for his share ($500,000).

Gruenberg enclosed a ballot with the letter, and said:

"To vote on whether the partnership should approve or reject this offer, please sign and return the enclosed ballot by overnight mail or fax. Pursuant to Section 9 of the Partnership Agreement, when ballots representing more than 50% of the interests in profits and losses have been received voting to accept the proposal, the Partnership will accept and sign the Contract to Lease."

However, at the time this letter was sent, the lease had already been signed. Specifically, the contract to lease was signed on May 20, 1994, by Brenda Rinzler and Jerald Mayerson, as RMS general partners, and by Allan Rinzler, as trustee for RMS.

Gruenberg testified the May 23, 1994 letter was his idea. However, Rinzler admitted recommending the cash call. Gruenberg was a personal friend of Rinzler and had represented Rinzler and Mayerson for fifteen years. Additionally, Gruenberg was a partner with Rinzler and Mayerson in two partnerships: Talbott Tower and Dayton Securities Group.

The testimony at trial indicated that the Sun transaction was a very lucrative deal. It was a "gold-plated opportunity" and would have been very easy to finance. Specifically, the lease was long-term and would generate $500,000 of net income per year. Likewise, Sun's credit was good and the property was located in a desirable area. According to Schafer's expert, the normal course of procedure for a partnership would have been to finance the transaction. The expert also said that while capital call contribution provisions are common, this particular capital call was not customary. Typically, capital calls are used for items like operating expenses, not to finance this type of construction. For example, if finding tenants for a building takes longer than expected, a capital call

could be issued for operating expenses. Schafer also testified that the capital call was not required.

On June 13, 1994, Schafer sent a letter to Rinzler and Mayerson, stating that he did not have the funds to meet a potential capital call. Schafer asked for copies of the signed contract to lease (which he did not have), and also requested a meeting to discuss the departure from their agreement that the Sun project would be financed. The three men then met on June 23, 1994. Schafer testified that he secretly tape-recorded this meeting because Rinzler had lied to him and threatened him, and because he knew the other partners were going to squeeze him out.

During the June meeting, Rinzler said that financing the Sun transaction did not make sense because interest rates were going up and the bank wanted the partners to personally sign for more than their shares. In fact (according to Rinzler), the bank wanted a personal guarantee for the entire amount. Rinzler and Mayerson also both stressed that they had the cash for their shares.

In the meeting, Rinzler stated that he had talked to NCB and to Star Bank. At first, Rinzler said he had nothing in writing from Star Bank. Later, he pulled a letter from Star Bank from his files. Referring to the letter, Rinzler said there was nothing in the letter that he was interested in.

The letter from Star Bank was dated May 17, 1994, and was addressed to RMS, as well as Mayerson and Rinzler. This letter followed a meeting in Rinzler's office on May 16, 1994. In the letter, Star Bank proposed a secured real estate mortgage for the Sun project, in an amount up to $2,500,000. Guarantors were to be Allan and Brenda Rinzler, and Jerald and Gail Mayerson, *with the guarantee limited to the top twenty five percent of the outstanding balance.* Both the interest rate and loan term (up to a twenty-year option) were specified. The letter listed certain conditions precedent to the commitment or lending, such as completion of a credit investigation, execution of a lease between RMS and Sun, etc.

Schafer was not told about, nor was he included in, the meeting with Star Bank. Further, although Schafer asked for a copy of the Star Bank letter on June 21, 1994, and on several subsequent occasions, he was not given a copy of the letter for more than fourteen months.

On September 26, 1994, Rinzler notified the partners of a meeting on October 7, 1994. The purpose of this meeting was to discuss how to fund the $2,000,000 obligation and to discuss what distributions, if any, would be made from the $500,000 rent. Present at this meeting were Allan Rinzler, Jerald Mayerson, Schafer, and Bob Gabringer. Gabringer worked for Rinzler and took notes. Schafer again tape-recorded the meeting.

At the meeting, Mayerson (on behalf of himself and his sons) and Rinzler (on behalf of his family) voted to fund the $2,000,000 through a cash call, which was then expected to be due on November 18, 1994. Mayerson voted for the cash call because of his age and health, *i.e.*, he did not want to incur long-term debt or debt of that magnitude. (Mayerson had been diagnosed with Parkinson's disease in April 1993.) Rinzler voted for the cash call for a number of reasons, *i.e.*, he was recovering from cancer, did not know if he would have a recurrence, and did not want to incur additional debt that could possibly be left to his wife and children. Both Rinzler and Mayerson again stressed that they had the cash for the deal. Rinzler additionally commented that he did not want to personally guarantee other peoples' debts and that it was not normal to do so. He also said his own sons would be responsible for their share if they wanted to come up with it. If they did not, their interest would be diluted, just like Schafer's interest would if he did not have the money.

During the meeting, Schafer argued that the cash call was not required because the deal could easily be financed. Among other things, Rinzler said that he had not explored any type of loan because he was not interested in loans.

At the meeting, Schafer also mentioned another option, *i.e.*, the partnership could agree that Schafer could borrow the $500,000 and finance the loan through a bank, by assigning rents and his partnership interest as had been done in the past. (As was mentioned earlier, the partnership had to consent before a partner could pledge his partnership interest or assign rents.) However, Rinzler refused to agree, even though Schafer made it clear that normal banking criteria required a mortgage and assignment of rents for loan approval

After the capital call was approved, Rinzler proposed holding all distributions from the Sun lease, which was expected at that time to begin paying rent in December 1994. Rinzler's stated reason was that money might be needed for development of the remaining 1.3 acres. Schafer strongly disagreed, pointing out that the ground would be debt-free and that withholding distributions would create further hardship for him in terms of trying to get a loan. Nonetheless, Rinzler and Mayerson voted to withhold distributions and to revisit the issue on April 11, 1995. Rinzler did indicate that if Schafer obtained a loan, Schafer could call another meeting to discuss the distribution issue. When the meeting ended, Schafer told his partners that he intended to sue for breach of the partnership agreement.

Following the October 7, 1994 meeting, Schafer consulted an attorney and also tried to get loans for his share. First, Schafer made a formal loan request to NCB. However, on October 17, 1994, NCB rejected an unsecured loan, due to Schafer's lack of liquidity, lack of cash flow from other investments, and lack of cash flow from the partnership to service the debt payments. NCB did say it

would consider a loan using a mortgage on the Sun ground and an assignment of rents and leases. Schafer also tried to get loans from Star Bank and Bank One, which also would not give a loan without a mortgage and pledging of rent. Schafer was never able to get the other RMS partners to agree to a mortgage and assignment of rents. Finally, Schafer contacted a loan broker about a loan to the partnership for the entire amount of the reimbursement. The broker said that the loan would be very easy to obtain and Schafer conveyed this to the partnership.

Due to delays, Sun did not take possession of the building as soon as expected, and the capital call deadline eventually occurred on May 3, 1995. The evidence at trial indicated that Mayerson did not have the cash for the capital call. For example, while Mayerson had substantial investment property, his available cash, savings, and securities on October 7, 1994, were about $195,000. Similarly, Mayerson's financial statement in August 1995 showed cash, savings, and securities of only $115,000. By contrast, Mayerson's share of the capital contribution was $450,000.

Likewise, the Mayerson and Rinzler sons did not have sufficient capital to meet their share of the capital call, i.e., $100,000 each. For example, Barrett Rinzler had only $19,000 in cash and securities as of April 1, 1995, and Mark Mayerson had about $26,000 in cash and money market funds as of March 30, 1995. Brenda Rinzler's financial statements of September 1, 1994, and August 15, 1995, showed that she had cash available of $257,000 and $275,000, respectively, to meet her capital contribution of $550,000. However, unlike the other parties, Brenda did have other substantial assets that could be easily liquidated.

Ultimately, the individual defendants satisfied their capital call contributions by borrowing money from NCB. At trial, Rinzler was unable to recall when he first went to the bank to borrow the money for the capital call. However, on December 16, 1994, the senior loan committee of NCB reviewed and approved a $2,000,000 secured loan. The guarantors on the loan were Allan Rinzler and Jerald Mayerson. According to the project analysis in the credit department report, the loan was to be used to finance the purchase of a building that Sun T.V. currently had under construction. However, the collateral for the loan was not the Sun building; instead, the loan was to be secured by commercial property in Cincinnati, Ohio. This commercial property belonged to 800 Broadway, which was a general partnership owned by the Mayerson and Rinzler families.

Subsequently, Allan and Brenda Rinzler, and Jerald and Gail Mayerson signed a six-month promissory note to NCB in the amount of $1,500,000. Payments were to begin on May 3, 1995, and were to continue until October 3, 1995. Under the note, the borrowers were jointly and severally liable. An open-end real estate mortgage, including rents, on the 800 Broadway property was also granted

to NCB on May 3, 1995, to secure the $1,500,000 loan. The Mayerson and Rinzler sons also signed a note dated April 3, 1995, making them jointly and severally liable to NCB in the amount of $500,000. That note was unsecured and was payable by October 3, 1995. However, on September 3, 1995, this latter note was modified and extended for a five-year term.

On May 5, 1995, the NCB senior loan committee reviewed and ratified the $1,500,000 and $500,000 loans made to the Mayersons and Rinzlers. Regarding these loans, the credit department report stated:

"This presentation represents a ratification of a $1,500,000 secured time note issued to provide funding of a capital call by R.M.S. Realty, Partnership. Allan and Brenda Rinzler and Jerald and Gail Mayerson will fund 75% of the needed funds with the remaining 25% (Credit 2) to come from Harley and Barrett Rinzler and Michael, Mark, and Richard Mayerson. The $500,000 term loan (Credit # 2) is to replace Everett Schafer's position in the partnership. To this point, Mr. Schafer has been unable to fund his portion of the capital call.

"* * *

"Credit # 1 [the $1,500,000 loan] is secured by a 45,000 sq. ft. office building located at 1501 Madison Rd. in Cincinnati, Ohio owned by 800 Broadway, Limited Partnership. Since the borrowers are also partners in 800 Broadway, they agreed to allow the building to be used as collateral. Both Credits # 1 and # 2 are expected to be short term and will most likely be paid from a future permanent market financing on the Sun building."

The report went on to discuss the Sun lease, stating, among other things:

"Since the lease is a triple net, the first year after tax cash flow to the partners is expected to be $378,000 based on a 40% tax rate. This cash flow could support a $2,000,000 loan at 9.5% amortized over 15 years at a 1.5x debt service coverage."

Further, the report said that "Sun has tremendous liquidity and working capital making it a very reliable payment source for the lease. Sun is the repayment source for both Credits # 1 and # 2."

And finally, the credit department report stated:

"In 1994 RMS Realty negotiated a lease with Sun T.V. and Appliance Stores that called for Sun to construct a free-standing retail building * * *. The agreement stated that RMS would reimburse Sun T.V. $2,000,000 from partnership capital calls and not finance the expenses within the partnership."

Contrary to the statements in the credit report, the contract to lease said nothing about a capital call. Instead, the contract specifically allowed RMS to encumber the real estate with a mortgage after commencement of Sun's lease

and after payment of Sun's construction costs. At that time, RMS was allowed a mortgage of up to seventy-five percent of the fair market value of the real estate, as improved, and debt service not greater than eighty percent of the lease payments.

Likewise, the lease agreement between Sun and RMS, which was signed in August 1994, said nothing about capital calls, nor did it restrict the ability of RMS to mortgage the premises. To the contrary, Sun specifically agreed in the lease to subordinate its interest in the premises to that of a mortgage lender of RMS.

When the building was completed, the fair market value of the real estate, as improved, was about $5,000,000. Based on Rinzler's own calculations, a loan of even $2,500,000 for a twenty-year term at 8.5 percent interest would have resulted in mortgage payments of $234,312 per year—or less than 47 percent of the lease payments.

Gruenberg, the partnership attorney, notified the partners on April 13, 1995, that RMS had received capital contributions from all partners except Schafer. The total amount of these contributions was $1,500,000. Between October 7, 1994, and May 3, 1995, Schafer asked a number of times, through counsel, for permission to secure a loan by placing a mortgage on the real estate and pledging his rents. However, permission was denied. In one discussion, Rinzler told Schafer's attorney that using the real estate as collateral was inappropriate because Schafer did not own the real estate, and placing a mortgage on the property would reduce the asset value of all the other partners' interests.

In an attempt to resolve the dispute, Schafer's attorney (Neil Freund) negotiated between March 28, 1995, and May 2, 1995, with the partnership and with an attorney (Ira Rubin), who had previously represented the partnership in a number of legal matters. On March 28, 1995, Freund sent Gruenberg a commitment letter from Bank One for a loan to Schafer. In the letter, Bank One approved a loan contingent on a mortgage on the property and assignment of rents. However, the majority partners would not agree to this. Subsequently, on April 3, 1995, Freund sent Gruenberg a letter from Vista Capital Group, indicating that Vista was willing to make a non-recourse loan to the partnership for $2,100,000. Again, Freund asked the partnership to either finance the transaction or to consent to Schafer's loan and the security requested by the bank.

Negotiations for the majority partners after this time were handled by Rubin. On April 10, 1995, Mayerson and Rinzler, through Rubin, offered to lend Schafer $500,000 based on various conditions, including a loan term of five years, assignment of Schafer's partnership interest, a loan fee of $5,000, and a guarantee

that not less than eighty percent of partnership distributions would be made to Schafer (a maximum of $100,000 per year) during the loan term.

In response, Freund sent a letter on April 11, 1995, stating that the terms of the proposed loan of April 10, 1995, were much less favorable than Schafer could get from a bank. According to Freund, Schafer would be willing to discuss a loan from the majority partners if they were willing to give him a loan under terms and conditions equal to or better than the bank's. Finally, Freund said Schafer would consider (1) that the partnership finance the $2,000,000 payment to Sun, (2) that the majority consent to Schafer's loan and the security requested by the bank, or (3) that the majority make a loan with terms and conditions the same or better than the bank's. At the time, Schafer was unaware that the majority had already financed the $2,000,000. In fact, he did not become aware of the loan until after the lawsuit was filed. Similarly, the partnership attorney, Gruenberg, did not know until May 3, 1995, that the majority partners had financed their capital contributions. Rubin, the attorney negotiating for the majority partners, also did not know about the financing until after the litigation was filed.

In any event, Freund pointed out to Rubin in a letter of April 26, 1995, that the five-year loan offer was unrealistic because it would cause Schafer to have a $95,000 negative cash flow on $100,000 of distributions. In the letter, Freund indicated that Schafer had again tried to obtain his own financing. Schafer was willing to pay $100,000 immediately in cash and had also obtained approval from Amerifirst Bank for a $400,000 loan based on assignment of Schafer's partnership interest, the partnership's agreement to one-hundred percent disbursement of Schafer's interest in the income ($125,000 per year); a negative pledge, *i.e.*, the partnership would not encumber the real estate with a mortgage during the twelve year loan term; and a guaranteed buy-out of the note balance by the partnership in the event of default. According to Freund, these terms should alleviate the partnership's objection to encumbering the property with a mortgage. This offer was also not accepted.

Rubin's testimony was that he asked Rinzler to run spread-sheets reflecting after-tax cash flows on various loan terms. At seven years, Schafer would have a small deficit, and at eight years, he would have a surplus of around sixty thousand dollars. According to Rubin, an offer of an eight-year loan was made during a phone conversation with Freund a day or two before May 2, 1995. Rinzler likewise testified that he had authorized an eight-year offer. Rubin had no written documentation of this offer, and Schafer denied receiving an offer for eight years. The spread sheets showing these loan scenarios were also not offered at trial.

A May 2, 1995 letter written by Freund is inconsistent with Rubin's testimony that an offer had been made a few days before. Specifically, Freund's letter

indicates that he had discussed the case in detail with Schafer and Schafer had authorized him to accept the April 10, 1995 proposal with one exception—that Schafer could not agree to a five-year loan, because it would generate a $300,000 dollar negative cash flow over the five-year period. In the letter, Freund stated that Schafer would accept a twelve-year loan.

On the same day, Rubin wrote back to Freund, stating that his clients were unwilling to lend Schafer $500,000 based on a twelve-year repayment schedule. In the letter, Rubin also said that he was "quite surprised" that Schafer continued to ask for a twelve-year loan in view of Freund's statement that he would recommend that Schafer compromise the matter by agreeing to repay a $500,000 loan over a period of eight years. Schafer's testimony was that he discussed this letter with his attorney after it was received. However, it was not his understanding that an offer of eight years had been made to him. He also said he did look at some information to see if he would have out-of-pocket expense over an eight-year period. Schafer did not recall the specific net after taxes, except that he was going to be losing some money.

No response was made to Rubin's May 2, 1995 letter. On May 3, 1995, Schafer did not contribute $500,000, and the remaining partners contributed the rest of their loan proceeds. At that point, Schafer's partnership interest was diluted by approximately nineteen percent, in accordance with paragraph 4 of the partnership agreement. Subsequently, on September 12, 1995, Schafer obtained various documents from RMS, including the Star Bank letter he had requested fourteen months earlier. Schafer then filed suit against RMS and the individual defendants on September 19, 1995.

As was indicated above, Allan Rinzler's stated reason, among others, for the capital call, was that he and his family did not want to incur debt. Additionally, both Rinzler and Mayerson said that they did not want to incur long-term debt due to health concerns. Rinzler also stressed that he did not want to put his family at risk by guaranteeing or having them guarantee others' obligations. However, the evidence both before and after the capital call indicates that Rinzler and Mayerson, as well as their families, incurred substantial debt, personally guaranteed loans, guaranteed loans of others, and pledged partnership assets to secure loans.

First, all the loans taken out to fund the capital call were based on joint and several liability. Second, the $1,500,000 loan was secured by a mortgage on partnership property and pledged rents. This particular note was then modified on October 3, 1995. By that time, Brenda and Allan Rinzler had repaid their portion and were released from liability. However, the mortgage on the 800 Broadway partnership property was not released; to the contrary, Brenda Rinzler ratified the terms and conditions of the previous mortgage given to

secure the loan. The maturity date on the remaining $440,000 obligation was then extended for a period of five more years on behalf of Jerald and Gail Mayerson.

Furthermore, in December 1995, Allan Rinzler personally signed an eight-to-ten-year loan for $4,500,000 to purchase a Roberds' building in Atlanta, Georgia. The purchasers of the building were 800 North Broadway (a partnership of Brenda Rinzler and JABS, Inc., in which Jerald Mayerson was the sole general partner) and Ponce de Leon Stores, a partnership in which the Rinzler family had an interest. Allan Rinzler was one of the guarantors on the $4,500,000 loan. This loan was secured by a mortgage on the property and a pledge of rents from the tenant, Roberds, Inc.

Additionally, on December 20, 1995, Brenda Rinzler and Jerald Mayerson signed a five-year $1,350,000 promissory note on behalf of 800 Broadway for funds used in conjunction with the purchase of the Roberds' building. The note was payable to NCB and was secured by a mortgage on 800 Broadway and an assignment of rents and leases. Although Rinzler could not recall if he guaranteed this particular note, documents submitted at trial revealed that loan approval was conditioned on guarantees from Allan Rinzler, Brenda Rinzler, and Jerald Mayerson, and that these parties all agreed to the loan conditions.

With the above factual background in mind, we will now consider the legal arguments of the defendants. As we mentioned earlier, the defendants claim that Schafer was precluded as a matter of law from bringing an action for breach of fiduciary duty because the vote for the capital call was authorized by the partnership agreement. In this regard, the defendants have cited a number of cases, including authority from this district, for the proposition that an action authorized by a partnership agreement, no matter how wrongful, cannot be a breach of fiduciary duty. We disagree with this theory conceptually. We also disagree that it correctly reflects a prior holding of our appellate district.

According to the defendants, this case is controlled by our prior decision in *Weston v. Weston Paper & Mfg. Co.* (May 11, 1994), Montgomery App. No. 13815, unreported, 1994 WL 179940, affirmed (1996), 74 Ohio St.3d 377, 658 N.E.2d 1058. However, we find *Weston* neither applicable nor controlling.

In *Weston*, we affirmed a trial court decision granting summary judgment to three directors of a corporation (Weston Paper) and an outside firm that valued corporations. The three directors were also the trustees of a voting trust which held about ninety-three percent of the corporation's stock. In 1972, a stock bonus program was started at the company, and gave certain employees, including the three directors, the option to receive one-half their annual bonuses in stock. Between 1972 and 1990, the outside firm valued the stock using the same valuation method. Under that method, the value for the stock in 1990 was $75

per share. However, in August 1990, the board of directors initiated a tender offer of $150 per share, based on the fact that some shareholders preferred owning more readily marketable investments. Ultimately, not enough shares were tendered and the offer was withdrawn.

Subsequently, the outside firm valued the stock at $130 per share, based primarily on the tender offer. The plaintiffs then sued, claiming that the directors breached a fiduciary duty to minority shareholders by causing the stock to be undervalued, by improperly diluting the plaintiffs' proportionate interest in the corporation, and by suppressing the market for the stock. The plaintiffs were shareholders who owned about 6.5 percent of the stock, but had not participated in the stock bonus program.

In affirming the dismissal of the case, we first found that the plaintiffs could not bring a direct action against the directors because they failed to show that they had any "concrete and definite expectations which were interfered with by the alleged wrongdoing." *Id.* at 5. We noted that these kinds of expectations include situations where improperly issued shares of stock make a plaintiff lose control of a majority of the voting stock. *Id.* Likewise, concrete and definite expectations are involved where a plaintiff expects to get a share of a pre-determined price for the corporation in a merger but is thwarted because the defendants improperly issue themselves additional shares of stock. *Id.*

Because the *Weston* plaintiffs did not offer evidence of such expectations, we found that they did not state a claim for dilution of their proportionate ownership interests. *Id.* Instead, their claim was one for diminution in value of their stock, *i.e.,* it was a typical derivative claim, and should have been brought in a shareholder's derivative suit. *Id.* at 6. We also held that the plaintiffs stated a claim against the directors for selling shares for less than adequate consideration. Again, however, we found this to be a derivative claim. *Id.*

As a preliminary point, we note that these holdings, if anything, support the cause of action in the present case. In *Weston*, we did not say that the plaintiffs had no claim; we simply said the claim should have been brought in a derivative action, instead of directly. In this regard, we observe that Schafer's claim is conceptually similar to the derivative claim we discussed in *Weston*, *i.e.,* the situation where a party's expectations on merger are thwarted because the defendants issue themselves additional stock.

In any event, the plaintiffs in *Weston* alternatively argued that they could maintain a direct action because Weston Paper was a close corporation. This claim was based on prior case law, under which minority shareholders were allowed to bring direct actions against majority shareholders for breach of fiduciary duty. *Id.* at 7. We rejected this argument because we found that

Weston Paper had no attributes of a close corporation other than a lack of market for its stock. *Id.* at 7–8.

We did find that the plaintiffs could bring a direct action against the directors in their capacity as trustees of the voting trust. However, we found no breach of fiduciary duty because the only relevant action the directors took as trustees was to vote for themselves for election to the Weston Paper board of directors. In this regard, we made the statements which are relied on by the defendants in the present case. Specifically, we first mentioned that the voting trust agreement allowed trustees to act as directors and to vote for the election of a trustee as a director. *Id.* at 8. Second, we said, "[t]herefore, the named directors did not violate any fiduciary duty in their capacities as trustees of the Voting Trust." *Id.*

By making these remarks, we did not adopt the general principle of law defendants urge, *i.e.*, that violations of fiduciary duty can never occur if an action is authorized in an applicable agreement. To the contrary, if our comments in *Weston* are read in this way, they would run counter to prior published case law from our own appellate district. For example, in *Leigh v. Crescent Square, Ltd.* (1992), 80 Ohio App.3d 231, 608 N.E.2d 1166, we considered, among other things, whether the fiduciary duties of general partners require that a partner be notified of expulsion proceedings being brought against him. The agreement in *Leigh* allowed general partners who were guilty of certain acts to be removed by written consent of a majority of the limited partners, upon written notice to the general partner being removed. *Id.* at 234, 608 N.E.2d at 1167–1168. Per this provision, a general partner was removed but was not notified of the expulsion until after the limited partners voted. The expelled partner then filed a lawsuit, claiming he should have received advance notice of the partnership's intention to remove him.

The trial court found that the defendants had acted properly because (1) the language of the agreement made ouster effective upon notice to the partner being removed, and (2) the plaintiff failed to identify any due process requirements in the agreement. *Id.* at 235, 608 N.E.2d at 1168. On appeal, the plaintiff raised two assignments of error. The first was based on a claim that the agreement required advance notice of expulsion proceedings. We found some ambiguity in the agreement but said that even if the trial court erred, the error was harmless because the plaintiff had not claimed any prejudice from a lack of notice, *i.e.*, advance notice would not have changed the outcome. *Id.* at 236, 608 N.E.2d at 1168.

The second assignment of error was based on a claim that the general partners' fiduciary duties required them to give advance notice of expulsion proceedings. In particular, the plaintiff argued that concealing the ouster proceedings violated the fiduciary duty owed to him by another general partner.

During our discussion of these points, we focused on general principles governing the fiduciary relationship between partners. One concept we stressed is that *fiduciary duty applies where partners can take advantage of their position to reap personal profit.* In that context, we cited a case in which two partners had been expelled in accordance with the provisions in a partnership agreement and had then brought suit for breach of fiduciary duty. Concerning the cited case, we commented:

"The court did not accept the plaintiffs' argument that the agreement contained implied provisions of due process, pointing out that all of the partners, including the plaintiffs, had signed the agreement without including such provisions, *and that the expulsion was not initiated in order for the remaining partners to extract financial gain.*" (Emphasis added.) *Id.* at 238, 608 N.E.2d at 1170.

Therefore, whether a technical breach has occurred is not the sole consideration. Implicit in the above quotation and our discussion in *Leigh* is the idea that actions taken in accordance with a partnership agreement can still be a breach of fiduciary duty if partners have improperly taken advantage of their position to obtain financial gain. We followed this rule in *Leigh* when we examined the circumstances in the case and concluded that the ouster (which was done in accordance with the partnership agreement) was "instituted in good faith and for legitimate business purposes." *Id.* The reverse side of this coin, obviously, is that actions allowed by an agreement can be a breach of fiduciary duty when they are not taken in good faith and for legitimate business purposes.

This rule is consistent with logic. It is also consistent with the law governing close corporations, which closely resemble partnerships. *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 108, 548 N.E.2d 217, 220. For example, in *Cruz v. S. Dayton Urological Assoc., Inc.* (1997), 121 Ohio App.3d 655, 700 N.E.2d 675, we considered fiduciary duty in the context of a close corporation. In *Cruz*, the physician-shareholders in a close corporation were employed under a written agreement that allowed termination of their employment contracts unilaterally and without specification of cause. Subsequently, a physician was terminated in accordance with the contract but nonetheless brought an action against the corporation, claiming that the other shareholders had breached their fiduciary duty by (1) terminating the physician without a legitimate business reason, (2) the manner of termination, and (3) reallocating overhead expenses to the physician's detriment. *Id.* at 663, 700 N.E.2d at 680.

We rejected the first claim, finding that when the doctor agreed to termination without specification of cause, he waived the right to argue that he could only be terminated for good cause. *Id.* However, we did allow the second and third claims, stating:

"Cruz [the doctor] also claimed a breach of fiduciary duty with respect to the manner of his termination. *He does not claim that the defendants owed him some different form of process, but that they owed him a duty to be fair and forthright in their dealings leading to his termination. He argues that they breached that duty by acts of duplicity. That claim, which is akin to fraud, is independent of whether the defendants were required to have good cause in order to terminate him.*

"Cruz also claimed a breach of fiduciary duty with respect to a reallocation of overhead expenses by the remaining shareholders. Like the manner of his termination, this claim presents issues independent of the question of cause. Even though the other shareholders of SDUA had the power to terminate Cruz without specification of cause, their exercise of that power was governed by a fiduciary duty, to the extent that it affected the value of his accrued interests in their common venture." (Emphasis added.) *Id.*

■ We note that the law is clear, concerning close corporations, that majority or controlling stockholders are liable, absent a legitimate business purpose, if they breach their heightened fiduciary duty to the minority by using their majority control to their own advantage and do not provide minority shareholders with an equal chance to benefit. See, *e.g., Gigax v. Repka* (1992), 83 Ohio App.3d 615, 615 N.E.2d 644; *Crosby,* 47 Ohio St.3d at 109, 548 N.E.2d at 220–221.

We understand the position defendants take, *i.e.,* that the partnership agreement controls. As a general proposition, we do not disagree. However, as we noted in *Cruz,* even if the decision itself cannot be contested, the manner in which the decision is made cannot violate the majority's fiduciary duty. Therefore, in the present case, while Schafer could not contest the capital call itself, he could bring an action for breach of fiduciary duty if the defendants acted in bad faith or in a duplicitous manner by voting for and proceeding with the capital call.

We believe our decision in the present case is controlled by *Leigh* and *Cruz,* which are previous published opinions of this district. For this reason, we will not discuss at great length the federal and out-of-state authority cited by both sides. However, referring to a sample of the cases, we note that a number of cases relied on by defendants involve situations that lack either allegations or evidence that actions taken in accordance with a partnership agreement were done for the purpose of improperly extracting personal gain though the partnership. For example, in *Nelson v. Warnke* (1984), 122 Ill.App.3d 381, 77 Ill.Dec. 900, 461 N.E.2d 523, a limited partner sued the general partner, alleging that the general partner breached a fiduciary duty by failing to invest partnership distributions. Specifically, the funds were held in noninterest bearing certificates of deposit before being distributed. The court of appeals rejected the breach of fiduciary duty claims because the partnership agreement allowed the general

partner to place partnership funds in noninterest bearing investments. 122 Ill.App.3d at 382–384, 77 Ill.Dec. at 900, 461 N.E.2d at 524. Notably absent from *Nelson* are allegations or evidence that the general partner improperly derived personal gain from the way in which he invested the funds.

Similarly, in *Deauville Corp. v. Federated Dept. Stores, Inc.* (C.A.5, 1985), 756 F.2d 1183, a joint venture agreement and statutory law allowed a department store (Ward) to withdraw from the agreement. There was no evidence of bad faith or improper purpose on Ward's part, nor did Ward gain a profit under the joint venture agreement at the expense of the plaintiff. Instead, Ward simply withdrew per the agreement and placed its store in another mall that had been its first choice. However, there was evidence that the developer of the other mall (Federated) had acted with malicious purpose in offering Ward an anchor spot. As a result, the plaintiff was allowed to proceed against Federated on claims for tortious interference with contracts and business relationships. *Id.* at 1194–1197.

Superficially, *Diamond Parking, Inc. v. Frontier Bldg. Ltd. Partnership* (1993), 72 Wash.App. 314, 864 P.2d 954, is somewhat similar to the present case. Specifically, in *Diamond Parking,* the general partners proposed a restructuring of partnership interests to raise capital. Limited partners who wished to risk more capital would receive an increased interest, and those who did not would have their partnership share reduced. 72 Wash.App. at 315, 864 P.2d at 956. Under the partnership agreement, major decisions, including amendment of the partnership agreement, had to be approved by partners owning seventy percent of the total partnership interest. Four partners, with a total seventy-four percent interest, voted in favor of the restructuring. However, the plaintiff elected not to contribute more capital and its interest was correspondingly reduced. *Id.* The plaintiff then brought suit against the partnership, limited partners, and general partners, alleging violation of the partnership agreement and breach of fiduciary duty.

As we said, on its face, *Diamond Parking* appears similar. In contrast to the present case, however, the court in *Diamond Parking* found "not a shred of evidence" to support the plaintiff's claim that the general partners breached their fiduciary duty. *Id.,* 72 Wash.App. at 318–319, 864 P.2d at 958. The particular alleged violations were that the general partners had a conflict of interest regarding the proposed amendment and had also failed to make full disclosure. *Id.,* 72 Wash.App. at 316–320, 864 P.2d at 957–958. Contrary to these claims, one of the other limited partners, whose interest was also diluted, testified that the proposal was the best course for the partnership. Specifically, the partnership needed to raise $2,000,000 to avoid foreclosure, the mortgage holder had refused additional concessions to address the cash flow situation, and there was no evidence that any other course was feasible. Moreover, there was no evidence

that the general partners had misrepresented or failed to disclose material information. *Id.,* 72 Wash.App. at 318–322, 864 P.2d at 958–959. Obviously, these facts differ from those of the present case.

Far more pertinent than the above authority is an Illinois case, cited by plaintiffs, in which limited partners sued a general partner for breach of fiduciary duty. See *Labovitz v. Dolan* (1989), 189 Ill.App.3d 403, 136 Ill.Dec. 780, 545 N.E.2d 304. In *Labovitz,* the breach of duty was based on allegations that a general partner used economic coercion to make limited partners sell their shares to him at a bargain price. As in the current case, the general partner's actions were "authorized" by the partnership agreement. Specifically, the partnership agreement gave the general partner sole discretion to determine the availability of cash flow for distribution to the partners. 189 Ill.App.3d at 405, 136 Ill.Dec. at 782, 545 N.E.2d at 306. It also gave him "full responsibility and exclusive and complete discretion in the management and control of the business and affairs of the partnership." *Id.*

Despite what appeared to be significant earnings, the general partner made only nominal cash distributions, and in 1985 and 1986, the limited partners had to pay taxes from their own funds on income retained by the partnership. *Id.,* 189 Ill.App.3d at 404–405, 136 Ill.Dec. at 781, 545 N.E.2d at 305. For example, in 1986, the partners had to report a taxable income of $216,750 per unit but received distributions of only $12,000 per unit. In November 1986, a company owned and controlled by the general partner offered to buy the limited partners' shares. Without going into substantial detail about the specific facts and figures, the sale let the limited partners realize some cash and also let them convert their 1986 taxable income into a sizeable tax loss. Most of the limited partners took this option and then sued the general partner for breach of fiduciary duty. *Id.,* 189 Ill.App.3d at 407–408, 136 Ill.Dec. at 783, 545 N.E.2d at 307.

Taking the position urged by the defendants in this case, the trial court dismissed the complaint, finding that the general partner's "acts were within the broad discretion granted him under the partnership agreement." *Id.,* 189 Ill.App.3d at 405, 136 Ill.Dec. at 781, 545 N.E.2d at 305. The plaintiffs then appealed. Like the defendants in the present case, the general partner in *Labovitz* argued on appeal that no inquiry could be made into his motivation because he had acted in accordance with the partnership agreement. *Id.,* 189 Ill.App.3d at 414, 136 Ill.Dec. at 788, 545 N.E.2d at 312. However, the appellate court disagreed.

As a preface to its analysis, the court quoted Judge Cardozo's famous description of fiduciary duty, *i.e.,* that "co-partners, owe to one another * * * the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A

trustee is held to something stricter than the morals of the market place. Not honesty alone but the punctilio of an honor the most sensitive is then the standard of behavior." (Citation omitted.) *Id.,* 189 Ill.App.3d at 408, 136 Ill.Dec. at 784, 545 N.E.2d at 308.

After discussing the arguments of the parties, the court then went on to conclude that the general partner owed his partners "a fiduciary duty, which necessarily encompasses the duty of exercising good faith, honesty, and fairness in his dealings with them and the funds of the partnership." *Id.,* 189 Ill.App.3d at 413, 136 Ill.Dec. at 786, 545 N.E.2d at 310. In particular, the court said:

"It is no answer to the claims that plaintiffs make in this case that partners have the right to establish among themselves their rights, duties and obligations, as though the exercise of that right releases, waives or delimits somehow the high fiduciary duty owed to them by the general partner—a gloss we do not find anywhere in our law. On the contrary, the fiduciary duty exists concurrently with the obligations set forth in the partnership agreement whether or not expressed therein." *Id.*

We agree with these statements.

Based on its discussion of fiduciary duties and the partnership agreement, the appellate court in *Labovitz* found that the plaintiffs were entitled to a trial on their claims that "the general partner refused unreasonably to distribute cash and thereby forced plaintiffs to continually dip into their own resources in order to pay heavy taxes on large earnings in a calculated effort to force them to sell their interests to an entity which * * * [the general partner] owned and controlled at a price well below at least the book value of those interests." *Id.,* 189 Ill.App.3d at 417, 136 Ill.Dec. at 789–790, 545 N.E.2d at 313–314.

The court also noted that while the partnership agreement gave the general partner "sole discretion" over distributions, his discretion was "encumbered by a supreme fiduciary duty of fairness, honesty, good faith, and loyalty to his partners." *Id.,* 189 Ill.App.3d at 416, 136 Ill.Dec. at 789, 545 N.E.2d at 313.

The approach taken in *Labovitz* is not unusual. See, *e.g., Wartski v. Bedford* (C.A.1, 1991), 926 F.2d 11, 20 (rejecting argument that action taken in accord with partnership agreement cannot be a breach of fiduciary duty. To the contrary, a partnership agreement cannot nullify fiduciary duty because fiduciary duty of partners is integral to partnership, whether expressly set forth or not), and *BT–I v. Equitable Life Assur. Soc.* (1999), 75 Cal.App. 4th 1406, 1411–1413, 89 Cal.Rptr.2d 811, 816 (partnership agreement "cannot relieve the general partner of its fiduciary duties in matters fundamentally related to the partnership business").

As an additional point, we note that other districts in Ohio have held that majority shareholders can be held liable, even where "proper procedures" are

followed, if the plaintiff shows facts tending to establish bad faith. See *Reynolds v. Wingers, Inc.* (1993), 86 Ohio App.3d 742, 748, 621 N.E.2d 1239, 1242–1243 (in close corporation case, Third District denies recovery for termination where proper procedures were followed, since the plaintiff did not show any acts of bad faith), and *Estate of Schroer v. Stamco Supply, Inc.* (1984), 19 Ohio App.3d 34, 40, 19 OBR 100, 106–107, 482 N.E.2d 975, 981–982 (First District allows recovery in "squeeze-out" situation, where close corporation acted in accord with law and charter, but nonetheless breached fiduciary duty to minority stockholders by not providing equal right to have stock purchased by corporation).

■■■■■ Based on the preceding discussion, we reject the defendants' argument that Schafer's action for breach of fiduciary duty was barred as a matter of law. Likewise, we reject the defendants' claim that the trial court erred in overruling their motions for directed verdict and for judgment notwithstanding the verdict. Specifically, we find substantial, probative evidence in the record that the defendants violated their heightened fiduciary duty of "utmost good faith and loyalty" to Schafer when they used their majority control to their advantage. *Cruz*, 121 Ohio App.3d at 662, 700 N.E.2d at 679. Although factual disputes existed, the record contains ample evidence that the Mayerson and Rinzler interests joined together and issued a capital call in order to squeeze Schafer out of a lucrative deal, dilute his partnership interest, and take the profit for themselves. Thus, while the partnership agreement allowed the partners to vote for capital calls "as required for the purposes of the partnership," the majority's ability in this regard was "encumbered by [the] supreme fiduciary duty of fairness, honesty, good faith, and loyalty" to their minority partner. *Labovitz*, 189 Ill.App.3d at 416, 136 Ill.Dec. at 789, 545 N.E.2d at 313.

For the same reasons, we also find that the jury verdict was not against the manifest weight of the evidence. "Weight of the evidence" has been defined as " 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " (Emphasis deleted.) *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546.

■■■■■ Consequently, when deciding whether a judgment is against the manifest weight of the evidence, we consider and weigh the evidence to see if the appropriate burden of persuasion has been met. *Id.* at 390, 678 N.E.2d at 548–549 (Cook, J., concurring). Even so, we must still defer to the trier of fact's greater ability to assess credibility. *Id.*, citing *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. The reason for this is that "the

demeanor, attitude, and credibility of each witness * * * [do] not translate well on the written page." *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 418, 674 N.E.2d 1159, 1162.

As we have noted in this opinion, the evidence at trial was not without dispute. Nonetheless, based on the evidence presented at trial, we find that Schafer met the burden of persuasion on his claims for breach of fiduciary duty and that the jury verdict was sustained by the greater weight of the evidence. Consequently, RMS's assignments of error one and three are without merit, as well as the part of assignment of error two that depends on Schafer's alleged inability to maintain a breach of fiduciary duty action. Similarly, assignments of error "A" and "B" of the individual defendants are without merit and are overruled.

## II. Failure to Disclose

As was noted above, RMS claims in its second assignment of error that the trial court applied an improper standard of fiduciary duty review and, therefore, erred in refusing to grant judgment notwithstanding the verdict. We have just rejected that argument. As another reason why the trial court should have granted judgment NOV, RMS contends that the jury finding on failure to disclose information could not have amounted to a breach of fiduciary duty.

At trial, the jury answered interrogatories indicating that RMS and the individual defendants breached their fiduciary duty to Schafer through a wrongful capital call and by failing to disclose information. The jury did not specify (nor was it asked to specify) the information that was not disclosed. RMS contends that the information in question was the May 17, 1994 letter from Star Bank. According to RMS, the failure to disclose this letter was not material and could not have resulted in a breach of fiduciary duty. The individual defendants raise the same points in their assignment of error "C." As a result, we will again consider the assignments of error together.

In this regard, the following facts are relevant. Before the jury was instructed, the parties and trial judge had a lengthy conference about jury instructions, interrogatories, and verdict forms. During the conference, the judge decided to give the jury separate verdict forms for RMS and the individual defendants on the breach-of-fiduciary-duty claim. None of the parties disagreed with this decision.

The judge then discussed interrogatories that had been submitted. At this point, counsel for RMS suggested that the jury should answer interrogatories to define the breach. Specifically, counsel for RMS said:

"What we really want to know is a succinct statement of what they think the breach was. For instance, if they think the breach wasn't giving Schafer a copy of the Sun letter as promptly as they should have, then obviously, from our view,

there would be no damages or accounting to flow from that. But if the breach was the Capital Call, which is the main issue in the case, that's a different case."

Plaintiff's counsel did not specifically respond to this point, other than to object to special interrogatories breaking down the alleged breach. Eventually, the judge decided to give the jury three interrogatories for RMS and three for the individual defendants. First, the jury had to decide if the defendants breached their fiduciary duty toward Schafer. If they answered yes, they were then to consider two further interrogatories asking (1) if the breach occurred as a result of a wrongful capital call and (2) if the breach occurred due to a failure to disclose information.

Subsequently, the jury found that RMS and the individual defendants had breached a fiduciary duty to Schafer. The jury then answered "yes" to the two additional interrogatories.

In considering the arguments of the defendants, we reject at the outset any claim that the jury findings relate only to the Star Bank letter. Although this was one item the jury could have focused on, the jury also heard evidence of numerous instances where information was concealed. Without repeating the entirety of our previous discussion, we note that the jury could reasonably have found that the defendants failed to disclose relevant information from nearly the beginning to the end of the Sun transaction. This information included the fact that Rinzler and Mayerson were even talking to Star Bank; that Star Bank was willing to loan RMS the money based on only a twenty-five percent personal guarantee; that Mayerson and members of the Mayerson and Rinzler families did not have the cash for the capital call despite their representations to the contrary; that the Sun contract to lease was already signed before the partnership was notified and was asked to approve the contract; that Rinzler personally guaranteed the loans of others and incurred debt despite his statements to the contrary; that both the Rinzler and Mayerson interests mortgaged partnership property and pledged rents while denying Schafer the same option to save his partnership interest; and that the majority partners obtained loans to fund the capital call. In fact, one can infer from the evidence that Rinzler and Mayerson also concealed their actions from the partnership attorneys and failed to disclose (or misrepresented) information to National City Bank. Consequently, we disagree that the jury's answers to the interrogatories necessarily encompassed only the failure to disclose the Star Bank letter.

Based on the evidence presented at trial, the above information was also material, *i.e.*, under the circumstances, the facts were likely to affect a reasonable person's conduct concerning the transaction. *Davis v. Sun Refining & Marketing Co.* (1996), 109 Ohio App.3d 42, 55, 671 N.E.2d 1049, 1059. On the other

hand, we do not think the information had to be material to be a breach of fiduciary duty.

■■■ We have stressed on a number of occasions that "general partners are to act toward each other with the utmost good faith and integrity." *Leigh,* 80 Ohio App.3d at 236, 608 N.E.2d at 1169. Further, "each partner is required to consult and inform his co-partner as to partnership matters or material questions not covered by the partnership agreement." *Id.* Notably, this rule is phrased in the alternative—"inform * * * as to partnership matters *or* material questions."

■■■ For the reasons previously discussed, Schafer's claim that the defendants breached their fiduciary duty is supported by substantial, probative evidence, upon which reasonable minds could differ. Consequently, the trial court did not err in overruling the defendants' motion for judgment notwithstanding the verdict. *Posin,* 45 Ohio St.2d at 275, 74 O.O.2d at 429–430, 344 N.E.2d at 338.

We also add that even if we accepted defendants' claims about the Star Bank letter, that would still not justify setting aside the verdict. In this regard, we note that defendants asked for the interrogatories, and the jury did not find just one breach of fiduciary duty—it found two. Defendants conceded that one of the breaches encompassed the major issue they saw in the case, *i.e.,* the capital call. Therefore, an accounting would have been triggered in any event.

In light of the preceding discussion, the second assignment of error of RMS and assignment of error "C" of the individual defendants are overruled.

### III. The Conversion Claim

#### A. Whether Conversion is Barred as a Matter of Law

Our analysis so far has disposed of the appeal of RMS in its entirety. However, various assignments of error raised by the individual defendants still remain. The next (assignment of error "D") involves whether Schafer is precluded as a matter of law from maintaining a conversion claim against the individual defendants. Assignments of error "E," "F," and "G" assume that a conversion claim can be brought, but question the merits and procedural posture of the claim.

The defendants' initial point is that Ohio does not recognize claims for conversion of intangible assets. The main case defendants rely on is *Zacchini v. Scripps–Howard Broadcasting Co.* (1976), 47 Ohio St.2d 224, 1 O.O.3d 129, 351 N.E.2d 454, reversed on other grounds (1977), 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965, which allegedly holds that conversion does not apply to *any* intangible right. According to defendants, this absolute prohibition means that Schafer cannot maintain an action for conversion as a matter of law. We believe that defendants have overstated the holding in *Zacchini.*

First of all, the Ohio Supreme Court began its discussion of conversion in *Zacchini* by noting that the common-law rule (that only tangible assets could be converted) no longer applied. In this regard, the court said:

"Conversion is a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights. * * * Although the original rule at common law was that only tangible chattels could be converted, it is now generally held that intangible rights which are customarily merged in or identified with some document may also be converted. Examples include drafts, * * * bank passbooks, * * * and deeds." *Id.* at 226–227, 1 O.O.3d at 130, 351 N.E.2d at 456–457.

After recognizing some situations where conversion claims were generally allowed for intangible assets, the court went on to discuss the particular intangible asset involved in the case, *i.e.*, the plaintiff's image. Specifically, Zacchini was a "human cannonball" and had been filmed by a television station. The station then showed the film clip during a news program. Zacchini sued, claiming among other things, that the television station was guilty of invading his privacy by appropriating his professional talents. After the trial court granted summary judgment, the court of appeals reversed, finding that Zacchini had stated claims for conversion and invasion of common-law copyright. Ultimately, the Supreme Court disagreed, and held that neither theory applied.

In rejecting Zacchini's claim, the court made the comment we referred to above, *i.e.*, that conversion claims had generally been allowed for some intangible rights. The court went on to say:

"But conversion does not apply to any intangible right, and certainly it has never been held that one's countenance or image is 'converted' by being photographed. The difficulties with any such holding are apparent. 'Taking' a photograph of someone does not in fact take anything from that person. If the photograph or film is only a conversion when shown to others, we may well ask to how many others it must be shown, and how often, before it becomes actionable. The distinguishing characteristic of conversion is the forced judicial sale of the chattel or right of which the owner has been wrongfully deprived. In the case of such intangible quasi-proprietary rights as are involved here, a forced sale would be largely absurd, because of the doubtfulness of determining what has been 'taken.' Is it the right to perform the act, to view it, to present it on television, to license its filming, or some other right? Judicial ingenuity could perhaps award damages and find a res said to be sold. But to extend the ambit of conversion to rights such as those claimed by plaintiff, which are more appropriately considered under wholly distinct legal principles, is confusing, unnecessary, and improper." *Id.* at 227, 1 O.O.3d at 130–131, 351 N.E.2d at 457.

Defendants rely on the first line of the above quote ("conversion does not apply to any intangible right") as authority for their claim that Schafer is absolutely prohibited from bringing a claim for conversion of an intangible right. We believe this is a misinterpretation of the word "any." Clearly, what the court meant is that *every* intangible right cannot support a conversion claim. This conclusion is obvious, since the court had just specifically mentioned situations where conversion claims are generally allowed in connection with intangible assets.

Accordingly, the Ohio Supreme Court has not rejected conversion as a potential cause of action for all intangible assets. Instead, the court has simply discussed one type of intangible asset that is not suitable. Furthermore, the court's comments indicate that it was concerned mainly with the difficulty in deciding exactly what had been taken, as a basis for assessing damages. As a preliminary point, we note that no such difficulty exists in the present case. The undisputed testimony was that Schafer's partnership interest was diminished by approximately nineteen percent. Moreover, defendants put on no evidence contesting the fair market value of the diminished interest at the time, *i.e.*, $695,400.

We note that we have not found any case in Ohio dealing with this specific issue. However, after *Zacchini*, both the Tenth District and the Ohio Supreme Court implied that a claim could be maintained for conversion of an asset far more "intangible" than the one involved in the present case. In *Hambleton v. R.G. Barry Corp.* (Aug. 30, 1983), Franklin App. No. 82AP–1021, 1983 WL 3673, unreported, affirmed in part and reversed in part (1984), 12 Ohio St.3d 179, 12 OBR 246, 465 N.E.2d 1298, the plaintiffs sued the defendants for wrongful retention of tangible personal property and for wrongful appropriation of intangible personal property.

On appeal, the Tenth District held that the tangible-personal-property claim was barred by the statute of limitations. This claim was based on the defendants' action in locking plaintiffs out of a laboratory in August 1971. *Id.* at 2. The intangible property claim was based on the defendants' nonconsensual use after August 1971 of plaintiffs' ideas, concepts, and developments for producing footwear. With regard to this claim, the Tenth District held that the plaintiffs' 1979 action was untimely because they had constructive notice that the footwear was being marketed in 1974. Further, while the plaintiffs tried to argue that they stated a claim for quasi-contract (which had a longer limitations period), the Tenth District found that they had pleaded an action for conversion instead. In this regard, the court noted:

"Although it is conceivable that a person's intellectual property might be utilized by another under circumstances which would give rise to a cause of action

in quasi contract, no such circumstances are pleaded in plaintiffs' complaint. Instead, the real purpose of the action is to recover damages for the wrongful taking or detention of plaintiffs' intangible property, and, as such, the bringing of the cause of action is governed by the four-year limitations period of R.C. 2305.09." *Id.* at 5.

Notably, the court did not reject the idea of a claim for conversion of such intangible property.

When the case was appealed further, the Ohio Supreme Court agreed with the Tenth District that the claim for conversion of intangible assets was time-barred, due to the constructive notice that the footwear was being marketed. 12 Ohio St.3d at 182, 12 OBR at 248–249, 465 N.E.2d at 1301. However, the Supreme Court also felt that plaintiffs had stated a cause of action for quasi-contract or contract in another count of their complaint. As a result, the court applied a six-year statute of limitations, meaning that the action was timely. The Supreme Court further noted that because the conversion action was time-barred, it did not need to decide if the plaintiffs had to elect either the tort or the contract action. Again, the court's comments are important for what is implied, *i.e.*, that a cause of action for conversion of intangible assets may be maintained.

Subsequently, in *Joyce v. Gen. Motors Corp.* (1990), 49 Ohio St.3d 93, 551 N.E.2d 172, the Ohio Supreme Court found that a plaintiff's abstract ideas were not property and could not be converted because they were "neither patented, copyrighted, trademarked nor imparted pursuant to a fiduciary or contractual relationship." *Id.* at 96, 551 N.E.2d at 175. The court also relied on the fact that the ideas were freely divulged. *Id.* at 97, 551 N.E.2d at 175–176. Again, however, the court did not reject the idea of a cause of action for all intangible assets. Instead, the court's comments indicate that even an idea can be considered property and can be the subject of a conversion action under certain circumstances.

Likewise, our decision in *Bourekis v. Saidel & Assoc.* (June 22, 1994), Montgomery App. No. 14105, unreported, 1994 WL 286304, implies that an action can be maintained for conversion of intangible property. In *Bourekis,* the plaintiff claimed, among other things, that the defendants had converted his one-fifth interest in a corporation as well as his distributive share of profits. On appeal, we affirmed the trial court's summary judgment for defendants on these claims. However, we did not do so because the claims were barred as a matter of law. Instead, our decision resulted from the plaintiff's failure to produce evidence that he had a one-fifth interest in the corporation. In reaching this conclusion, we first commented that conversion is defined as " 'any exercise of dominion or control wrongfully exerted over the personal property of another in denial of or under a claim inconsistent with his rights.' " *Id.* at 6. We then noted

that " '[t]he general rule is that before the plaintiff can recover in an action for conversion, he must show a title or interest in himself.' " *Id.*

The basis of the plaintiff's claim of one-fifth ownership was his payment of twenty percent of the premiums for a "key-man" insurance policy. According to the plaintiff, the five purchasers of the policy reached a buy-sell agreement for the transition of ownership of the corporation. However, the plaintiff admitted that the agreement was never executed, that he had no stock, and that he never entered into an agreement to purchase stock. *Id.* Instead, the undisputed evidence was that another dentist was the sole shareholder in the corporation. Under the circumstances, we held that summary judgment was proper because the plaintiff failed to show that he had a one-fifth interest.

Significantly, we see little distinction between a one-fifth interest in a corporation (particularly one of the type involved in *Bourekis*) and a twenty-five percent interest in a partnership. Furthermore, we do not read any of these cases as unilaterally prohibiting conversion claims based on intangible assets. Instead, we believe that the correct approach is to analyze the particular type of intangible asset, to see if allowing a conversion claim makes sense.

Based on the allegations made in the complaint and the evidence at trial, we feel conversion was an appropriate basis for recovery in the present case. Specifically, Schafer had a undisputed interest of twenty-five percent in RMS before the capital call. Under the law, "[t]he property rights of a partner are his rights in specific partnership property, his interest in the partnership, and his right to participate in the management." R.C. 1775.23.

Based on the alleged wrongful acts of the defendants, Schafer lost nineteen percent of his property interest and the defendants' asserted control over the property, in opposition to Schafer's claim. This was not the type of formless, imprecise interest rejected in *Zacchini,* and no logical reason exists for precluding such a claim. Furthermore, the damages were readily ascertainable. Specifically, "[t]he measure of damages in a conversion action is the value of the converted property at the time of the conversion." *Brumm v. McDonald & Co. Securities, Inc.* (1992), 78 Ohio App.3d 96, 104, 603 N.E.2d 1141, 1146. Again, there was no real dispute about the fair market value of Schafer's interest at the time it was allegedly converted.

Moreover, as we said earlier, conversion actions are allowed where an intangible property interest is identified with a document. See, *e.g., Zacchini,* 47 Ohio St.2d at 226–227, 1 O.O.3d at 130–131, 351 N.E.2d at 456–457, and *Resource Ventures, Inc. v. Resources Mgt. Internatl., Inc.* (D.Del.1999), 42 F.Supp.2d 423. For example, in *Resource Ventures,* the court allowed a claim for conversion of proprietary information because the plaintiff had a property interest in the

information, which included plans, designs, technology, and specifications. *Id.* at 438. Such claims have been allowed even where the interest is evidenced by computerized book entries rather than a written document held by the plaintiff. See *Lucas v. Lucas* (C.A.8, 1991), 946 F.2d 1318. Specifically, in *Lucas,* ownership of securities was not evidenced by stock certificates but by a computerized book entry. *Id.* at 1323. Nonetheless, the court allowed the conversion claim because the owner held the exclusive right to collect dividends, accumulate equity, transfer to a different broker, and dispose of the security. *Id.* Again, we do not see a great distinction between that type of situation and the one in the present case, where partners have rights under the written partnership agreement to receive distributions, and to assign, transfer, or dispose of their partnership interest. Consequently, to the extent that identification or merger with a written document might be required, we find that Schafer's partnership interest was so identified or merged.

Finally, we note that courts in other jurisdictions have allowed claims for conversion of assets more intangible than Schafer's partnership interest. See, *e.g., Conant v. Karris* (1987), 165 Ill.App.3d 783, 117 Ill.Dec. 406, 520 N.E.2d 757 (claim for conversion of confidential information); *Wellington Sys., Inc. v. Redding Group, Inc.* (1998), 49 Conn.App. 152, 714 A.2d 21 (summary judgment inappropriately granted where plaintiff alleged conversion of money, equipment, and contractual rights); *Freeman v. Corbin* (Fla.App.1980), 391 So.2d 731, 732 (conversion claim allowed for wrongful taking over of intangible interests in a business venture); and *CBS, Inc. v. Garrod* (M.D.Fla.1985), 622 F.Supp. 532, 535 (applying Florida law to allow conversion claim for intangible property interest in time, effort, and expense of making recordings).

Accordingly, having reviewed pertinent case law, we see no reason why Schafer's conversion claim should be barred as a matter of law. Assignment of error "D" is, therefore, without merit and is overruled.

### B. The Merits of the Conversion Claim

In assignment of error "E," the individual defendants contend that the trial court erred in overruling their motion for directed verdict and motion for judgment notwithstanding the verdict on the conversion claim. The primary argument defendants make in this context is that the capital call was not wrongful because it was permitted by the partnership agreement. Based on our prior discussion of the evidence, we disagree. Substantial, probative evidence was presented at trial indicating that the capital call was made for the purpose of depriving Schafer of his partnership interest.

The individual defendants additionally contend in assignment of error "F" that Schafer did not have a property interest that was converted because the

increase in partnership assets never belonged to Schafer. According to defendants, Schafer did not pay for the building and never owned that property. Therefore, Schafer had no property interest that was converted. We reject this argument because it simply misstates the evidence.

As we mentioned earlier, when the RMS partnership began, Schafer had a twenty-five percent interest in the only partnership asset, *i.e.*, a 5.22-acre commercial property that was originally purchased for $800,000. Between 1986, when the property was purchased, and May 3, 1995 (the day the money for the capital call was due), the fair market value of the undeveloped property (including both the front and back parcels) had appreciated to approximately $3,660,000. Twenty-five percent of that amount is $915,000, and nineteen percent is $695,400. When Schafer's interest was diluted by about nineteen percent, on May 3, 1995, the decrease in value was, therefore, $695,400. Schafer testified that this was the total amount of his damages as of May 3, 1995. He also specifically said that he did not take the value of the building into consideration because he did not contribute to its purchase. The jury then awarded $695,400 to Schafer. Significantly, this amount did not include any increase in partnership assets caused by the construction of the Sun building ($2,000,000). Consequently, we find that defendants are being less than candid when they say that Schafer had no property interest to be converted because he did not pay for the building. We further note that no defendant put on any evidence disputing Schafer's analysis of the fair market value of the property as of May 3, 1995. In fact, Rinzler's own proformas used a value of $3,000,000 for the undeveloped four-acre Sun parcel, without taking the value of the Sun building or the back parcel of land into account.

An argument might be made that Schafer's damages should have been offset by some amount to reflect his retention of a six-percent interest in partnership assets that were substantially increased as a result of the Sun deal. However, defendants did not file a counterclaim on this issue, did not present evidence at trial on what such an amount might be, and did not ask for a jury instruction concerning an offset to the claimed damages. In fact, as we said, defendants did not really dispute Schafer's testimony about damages during the jury trial. Therefore, while other methods of calculating damages could have been used, defendants waived this matter by failing to present any such alternatives to the trial court or to the jury. See, *e.g.*, *Crandall v. Fairborn* (May 7, 1999), Greene App. Nos. 98CA0111 and 98CV0329, unreported, at 3, 1999 WL 318365 (parties may not complain on appeal about error which they induced).

In view of the foregoing discussion, we find assignments of error "E" and "F" without merit, and they are overruled.

## C. Procedural Status of the Conversion Claim

The next argument of the individual defendants (assignment of error "G") is that the trial court erred by submitting the conversion claim as a damages action to the jury instead of having the matter decided in an accounting. In the complaint, Schafer sued the seven other partners of RMS individually and as general partners. Allan Rinzler was sued individually and as trustee and agent for RMS. Although both the complaint and Schafer's answer to an RMS counterclaim contained a jury demand, no one filed a motion to strike the demand.

Originally, the case was set for jury trial on September 3, 1996, but it was later reset for July 14, 1997. Trial began as scheduled, and the jury was empaneled on July 14, 1997. Subsequently, during trial (on July 16), the individual defendants filed a motion *in limine*, asking the court to withhold evidence of punitive and compensatory damages from the jury. Schafer objected, pointing out that he was entitled to a jury trial on his common-law conversion claim. Additionally, Schafer objected to the timeliness of the motion, since the most recent case on which the defendants relied was issued more than a year before trial.

The trial court did not issue a written decision, but overruled the motion *in limine* during trial. Schafer was then allowed to testify on damages, *i.e.*, about the fair market value of the property at the time of the alleged conversion. And, finally, the court instructed the jury on conversion, proximate cause, and damages.

We are inclined to agree that the motion was untimely, since defendants could have filed a motion well before trial but chose not to do so. Putting this fact aside, we note first that the right to trial by jury in civil actions is fundamental but exists only for actions recognized as jury issues at common law before the Ohio Constitution was adopted in 1851. *Digital & Analog Design Corp. v. N. Supply Co.* (1992), 63 Ohio St.3d 657, 661, 590 N.E.2d 737, 741–742. Conversion is clearly a cause of action for which a jury trial existed before 1851. See, *e.g., Wyman v. Hurlburt* (1843), 12 Ohio 81, 86, 1843 WL 13. Accordingly, Schafer was entitled to have a jury decide the conversion claim.

Despite this fact, defendants contend that under *Dunn v. Zimmerman* (1994), 69 Ohio St.3d 304, 631 N.E.2d 1040, the conversion claim should have been determined in an accounting. In *Dunn*, the Ohio Supreme Court considered whether a partner could maintain an action for breach of fiduciary duty against another partner. *Id.* at 305, 631 N.E.2d at 1041. Construing R.C. 1775.20 and 1775.21, the court found that breaches of fiduciary duty among partners are actionable at law. *Id.* Further, the court held that "the usual and normal

remedy for a breach of fiduciary duty or other legal conflict among partners is an accounting." *Id.* During the same discussion, the court also said:

"The broad scope of circumstances listed in R.C. 1775.21(A) to (D) indicates that an accounting is an appropriate remedy for a range of wrongs, embracing more than just breach of fiduciary duty. In the instant case, for example, the complaint contained counts for conversion and conspiracy. Depending on the specific facts of the case, such independent claims *may be* grounds for an accounting under subsections (A), (C) or (D)." (Emphasis added.) *Id.* at 307, 631 N.E.2d at 1042.

Relying on this language, defendants contend, as we noted, that the trial court erred in allowing the jury to determine damages. However, we disagree for two reasons. First, the language used in *Dunn* was permissive, not mandatory, *i.e.,* the court said accounting is the usual remedy and that independent claims "may be" grounds for an accounting. The court did not say that an accounting is the only remedy.

Second, we have previously recognized that an accounting is "unnecessary where it would serve no useful purpose." *Hanes v. Giambrone* (1984), 14 Ohio App.3d 400, 404, 14 OBR 518, 522, 471 N.E.2d 801, 806. In *Hanes,* we stressed that an action at law can be maintained between partners in the absence of an accounting, "even where the partnership transaction is the basis of the suit, if the facts are such that no complex accounting involving a variety of partnership transactions is necessary." *Id.*

In *Dunn,* the Supreme Court cited *Hanes,* as well as other cases that had applied exceptions to the traditional rule of an accounting. The court explained that these exceptions have arisen because the reasons for the traditional rule do not apply in certain cases. As an example, the court said a formal accounting is "a pointless exercise * * * [in cases involving] disputes over a very limited time or number of transactions, whose resolution would not require a searching inquiry into partnership affairs." *Id.* at 309, 631 N.E.2d at 1044. The court did say that such cases would be exceptional, and the trial court would rarely abuse its discretion in ordering an accounting as a method of determining a legal dispute between partners. *Id.* Again, however, this language is permissive.

Based on the circumstances of this case, we believe such an "exceptional" situation exists. First of all, this was not a complicated partnership involving large numbers of parties or properties. Instead, the partnership consisted of a few people who owned one piece of property. Essentially all the partnership has done since 1986, other than reimbursing Sun for the building and taking care of a few leases, is to collect rent and distribute the proceeds. Furthermore, the events in this case took place over a limited period of time and involved one

partnership transaction, which, again, was not complex. Despite the large amount of pleadings generated in this case (mostly due to discovery disputes), the issues were not difficult and did not require a searching inquiry into partnership affairs. Accordingly, we find that the trial court acted correctly in allowing the jury to decide damages caused by the alleged conversion.

We also see no inconsistency between this ruling and our prior decision in *Caras v. Green & Green* (June 28, 1996), Montgomery App. No. 14943, unreported, 1996 WL 407861. According to defendants, *Caras* requires that the damages award for conversion be reversed. Again, we disagree. In *Caras*, a legal partnership was sued by an employee who claimed he was a forty percent equity partner and had been deprived of partnership property and profits. The defendants counterclaimed for $93,000 in accrued fees and unpaid expenses on various cases. Eventually, the matter was tried to a jury on claims of fraud and misrepresentation, promissory estoppel, unjust enrichment, and breach of fiduciary duty. The jury then returned a general verdict in the amount of $100,000 for the plaintiff.

We reversed the case on appeal because the trial court had improperly submitted mutually exclusive claims to the jury (unjust enrichment and contract). Moreover, the unjust enrichment claim was unsupported by the evidence. *Id.* at 5–6. As an additional matter, the trial court refused to give an instruction that would have allowed the jury to return a verdict ordering an accounting. Instead, the court had the jury consider what damages were caused by the breach of fiduciary duty. We held that this was error because "[t]he usual remedy for breach of fiduciary duty is an accounting, not an award of damages unrelated to an accounting." *Id.* at 7

Significantly, the jury in *Caras* did consider and decide damages on various legal claims against the partnership, including fraud and misrepresentation, promissory estoppel, and breach of contract. Had we believed that this was error, we would certainly have said so when we reversed the case and remanded it for trial. Consequently, *Caras* actually undermines defendants' argument that the jury in this case should not have been allowed to decide damages for the conversion claim.

Furthermore, to the extent that an accounting was warranted in *Caras*, we note that it is factually distinguishable from the present case. Specifically, the plaintiff's claims in *Caras* involved shares of fees for cases on which the plaintiff had worked. However, the fees had not been billed nor had they been collected at the time he resigned. The defendants had also counterclaimed for accrued fees and expenses on cases the plaintiff took with him when he left the firm. *Id.* at 1 and 4. Although we did not mention the precise number of cases involved, a

searching inquiry into partnership affairs would clearly have been required to resolve these issues.

Based on the preceding discussion, we find that the trial court did not err in submitting the conversion claim to the jury. Accordingly, assignment of error "G" is without merit and is overruled.

IV. Status of Allan Rinzler

In assignment of error "H," the individual defendants contend that the jury verdicts for breach of fiduciary duty and conversion should be reversed because the trial court improperly instructed the jury that Allan Rinzler should be considered a partner in RMS. Defendants' argument in this context is based on the fact that Rinzler had no fiduciary duty towards Schafer because he was technically not a partner.

When we review jury instructions, we "consider the jury charge as a whole and * * * [decide if the charge] probably misled the jury in a matter materially affecting the complaining party's substantial rights." *Kokitka v. Ford Motor Co.* (1995), 73 Ohio St.3d 89, 93, 652 N.E.2d 671, 674.

We have considered the jury charge as a whole and do not find that it misled the jury in a manner materially affecting the individual defendants' rights. After giving standard instructions on credibility of witnesses and so forth, the trial court first discussed the breach of fiduciary duty claim with the jury. Concerning that claim, the court told the jury:

"The Plaintiff, Everett Schafer, claims that the defendants breached their fiduciary duties to him as a member of the Partnership, RMS Realty. For purposes of your deliberations in this case, you should consider Alan [*sic*] Rinzler and Gerald Mayerson as partners in RMS Realty."

The court then went on to discuss various aspects of the partners' fiduciary duty. Next, the court told the jury with regard to conversion that "[t]he Plaintiff, Everett Schafer, claims that the individual Defendants converted Plaintiff's partnership interest." This discussion was followed by instructions on the elements of conversion, proximate cause, and damages. And finally, the court discussed Schafer's claim against Mayerson for a real estate commission.

Taking the breach of fiduciary duty claim first, the evidence is undisputed that Allan Rinzler acted as an agent for family members who were partners in RMS. As we said earlier, Rinzler did transfer his partnership interest in RMS to his wife, Brenda, in 1987. However, Brenda, testified that she relied on her husband concerning RMS and turned everything over to him to handle. Likewise, Rinzler's two sons (who received their shares in 1993 and 1994) also gave their father authority to act on their behalf. This delegation of authority cannot

insulate Mrs. Rinzler and her sons from liability. To the contrary, Allan Rinzler was bound to observe the fiduciary duties of his principals, and they are also bound by his alleged wrongful acts. Furthermore, concerning the conversion claim, Allan Rinzler's role as an agent did not relieve him from liability for his own wrongful acts.

In this regard, the comments of the Sixth District in *Foust v. Valleybrook Realty Co.* (1981), 4 Ohio App.3d 164, 4 OBR 264, 446 N.E.2d 1122, are pertinent:

"The relation of principal and agent is always regarded by the court as a fiduciary one, implying trust and confidence. · All acts and contracts of an agent done or made within the discharge of his duties, and within the scope of his authority, whether that authority is express, implied, or apparent, are obligatory upon the principal, and no ratification or assent on the latter's part is necessary to give them validity. * * * The principal is always liable to third persons for misfeasances and the omission of duty of his agent, in all cases within the scope of his agency, equally as for acts of his own although the agent himself is liable for positive wrongful acts and misfeasances committed while acting as agent." *Id.* at 167, 4 OBR at 268, 446 N.E.2d at 1127.

 Therefore, Brenda Rinzler and her sons were liable for any alleged omissions of duty and misfeasances (specifically breach of fiduciary duty and conversion) of their agent, Allan Rinzler, as if they had committed the acts themselves. Similarly, Allan was liable for his own wrongful acts.

 While the trial court could have given an instruction on agency, we do not think that the jury was misled in any way by being told that Rinzler acted as a partner for purposes of this case. As we mentioned earlier, the testimony at trial, even from Rinzler's own family, was that despite the technical conveyance of ownership, Rinzler retained sufficient control over the partnership interest to be considered a *de facto* partner. Specifically, even after the conveyance, Rinzler managed the partnership and made unilateral decisions about significant partnership transactions as if he still retained his interest. Indeed, the evidence on this point was so strong that one could find Rinzler to be the major partnership force in all transactions.

Consequently, because the trial court did not mislead the jury by saying that Rinzler should be considered a partner for purposes of this case, assignment of error "H" is without merit and is overruled.

## V. Admission of Expert Testimony on Damages

Under assignment of error "I," the individual defendants contend that the trial court erred in allowing Schafer's expert, Mark Fornes, to offer an opinion on damages. According to defendants, Fornes did not offer an opinion on the value

of the RMS property when his deposition was taken. Defendants further say that their rights were substantially affected because Fornes's opinion was the only testimony about the value of the RMS property.

We are perplexed by this argument, since Schafer specifically testified at trial about damages and about the fair market value of the RMS property at the time his interest was allegedly converted. Moreover, as we stressed earlier—there was no dispute at trial about the value of the property.

We note from reading Fornes's deposition that Fornes was an expert on valuation of property, as well as other pertinent matters. However, Fornes did not give an opinion during his deposition about the fair market value of the RMS property. At the end of the deposition (which broke up in some acrimony), Fornes said he was not sure if he would offer opinions other than the ones he had already given. Apparently, defendants did not later receive any additional information about Fornes's opinions.

 Under Civ.R. 26(E), parties have a duty to seasonably supplement their discovery responses regarding the identity of expert witnesses and the subject matter on which the expert is expected to testify. This duty applies to new subject matter as opposed to matter which can be labeled as a mere nuance of the deposition testimony. *Walker v. Holland* (1997), 117 Ohio App.3d 775, 786, 691 N.E.2d 719, 726. Exclusion of the testimony is an appropriate sanction for a failure to supplement. Normally, appellate courts are reluctant to interfere "[a]bsent an abuse of the trial court's discretion and material prejudice to the affected party." *Id.* at 791, 691 N.E.2d at 729.

 In this case, Fornes's opinion on value was not simply a "mere nuance" but was new subject matter, meaning that Schafer should have supplemented discovery. However, even if the trial court abused its discretion in allowing the evidence, we cannot find any material prejudice to defendants. As we said, Schafer testified in detail about the fair market value of the property (before Fornes got on the stand), and this was an issue the defense did not even try to contest at trial. Accordingly, assignment of error "I" is not well taken and is overruled.

### VI. The Doctrine of Mitigation or Avoidable Consequences

In their final assignment of error ("J"), the individual defendants claim that the trial court erred in refusing to instruct the jury on the doctrine of mitigation or avoidable consequences. The argument in this regard is that Schafer could have avoided loss of his nineteen percent interest by accepting loans offered by Rinzler and Mayerson. This assignment of error is intertwined with cross-assignment of error (A)(6), in which Schafer contends that the trial court erred by admitting

evidence of statements of compromise and settlement negotiations between Schafer and the defendants. As a result, our discussion will apply to both of these issues.

As we mentioned earlier, testimony was offered at trial about negotiations between Schafer's counsel and the partnership from March 28, 1995, through May 2, 1995. Schafer filed a motion *in limine* before trial, objecting to this evidence, based on the prohibition in Evid.R. 408 against admission of settlement offers or statements made in compromise negotiations. In response, the defendants argued that the evidence was relevant both to their motives and to the availability of funds to Schafer at the time of the capital call. The trial court agreed and allowed substantial inquiry in this area.

At the end of trial, the individual defendants submitted a jury instruction on mitigation of damages. This instruction stated:

"An injured party is under a duty to investigate its damages and may not recover those damages which is [sic] could have reasonably avoided. In order to find that the Plaintiff is entitled to damages, Plaintiff must prove that he could not have reasonably avoided such damages."

Mitigation was also raised in the defendants' proposed interrogatories, which asked the jury to specify whether Schafer "reasonably attempted to mitigate his damages."

The trial judge refused to give the instruction and interrogatories, stating that mitigation of damages had not been an issue in the case. The judge also said that if the offers to loan money were viewed as mitigation of damages, then Schafer was correct in his original position, *i.e.*, that the loans were an offer to settle a dispute.

Concerning offers to compromise, Evid.R. 408 states:

"Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

■ Denial of a motion *in limine* is also "within the sound discretion of the trial judge." *Harman Group Corporate Finance, Inc. v. Academy of Medicine of Columbus & Franklin Cty.* (1994), 94 Ohio App.3d 712, 721, 641 N.E.2d 785, 790.

After reviewing this matter, we find that the trial court abused its discretion in admitting some of the evidence, but the error was harmless. However, we do agree with the trial court that mitigation of damages was not an issue in the case. Accordingly, we overrule both the assignment of error and the cross-assignment of error.

■ The evidence that was admitted falls directly within Evid.R. 408, as it involved offers to furnish and to accept valuable consideration to compromise a disputed claim. Specifically, Schafer told Rinzler and Mayerson in October 1994 (when the capital call was approved) that he intended to sue for breach of the partnership agreement. Following the October 1994 meeting, attorneys retained by the parties did try to negotiate a settlement of the dispute. In fact, Rubin's letter of April 10, 1995, says that "my client's offer to make the loan to Mr. Schafer is subject to satisfactory resolution of any and all outstanding disputes between Mr. Schafer and my client concerning or relating to RMS Realty." Given these facts as well as the testimony at trial, both sides obviously felt a dispute existed. Furthermore, while Schafer had not yet filed suit, an existing lawsuit is not required for a dispute to exist. See, *e.g., Arthur Young & Co. v. Kelly* (Apr. 28, 1988), Franklin App. No. 87AP–800, unreported, at 2, 1988 WL 41069. Consequently, the negotiations and letters fit within the prohibition in Evid.R. 408.

The reason for excluding this type of evidence is that parties may offer to compromise based on factors besides potential liability. Additionally, the rule is designed to encourage settlement of disputes. *Fireman's Fund Ins. Co. v. BPS Co.* (1985), 23 Ohio App.3d 56, 62, 23 OBR 101, 106–107, 491 N.E.2d 365, 372. However, as the defendants point out, the rule makes an exception when evidence is offered for another purpose, such as showing witness bias. As an example, we have approved admission of a settlement proposal where it was offered to show a lack of malice on the defendants' part. *Hignite v. Trout* (Apr. 28, 1989), Greene App. No. 88CA5, unreported, at 14, 1989 WL 43035.

■ In the present case, the defendants' motives were at issue, and we believe that they were entitled to offer evidence bearing on that point. An argument could be made that discussions in the spring of 1995 were irrelevant because the wrongful acts occurred in October 1994, when the defendants voted for a capital call and to withhold distributions. However, one could also argue that a continuing course of conduct took place up until the last day capital contributions could be made. In other words, if the defendants reversed their

wrongful course before that time, the conversion would not have occurred. Similarly, even if breaches of fiduciary duty had previously taken place, they would not have proximately caused any harm. For these reasons, the trial court acted properly in admitting evidence of the offers to loan Schafer money.

However, while the offers to compromise were generally admissible, we are troubled by some evidence which was allowed. Specifically, the offers of compromise and the letters flowing between attorneys were brought up by the defense during cross-examination of Schafer and during the defendants' direct examination of Ira Rubin and Allan Rinzler. We think that the defendants were entitled to cross-examine Schafer about the offers to cast doubt on Schafer's claim that he could not meet the capital call. Likewise, Rinzler's testimony about the offers was appropriate on the issue of the defendants' motives. The jury was entitled to weigh the evidence and make its own judgment about the sincerity, motives, or actions of any of the parties.

However, Rubin's testimony about negotiations and phone conversations with Schafer's attorney, and letters flowing between the two, was not appropriate. Significantly, some of this testimony could only have been countered by Schafer's counsel, who was then representing Schafer at trial. This left Schafer in the undesirable position of either leaving Rubin's testimony unrebutted or calling his own attorney as a witness. Unfortunately, the latter choice could have resulted in disqualification of Schafer's attorney during the middle of trial. See *155 N. High, Ltd. v. Cincinnati Ins. Co.* (1995), 72 Ohio St.3d 423, 650 N.E.2d 869.

The reason the trial court's action is troubling is that attorneys frequently negotiate on behalf of clients before litigation begins—for the very purpose of avoiding a lawsuit. It takes little imagination to conclude that settlement processes will be significantly hampered if attorneys think their conversations with opposing counsel will be offered as evidence at trial or that they will be forced into the ethical dilemma presented by this case.

Consequently, we find that the trial court erred in allowing some of the testimony about loan offers. However, the error was harmless, *i.e.*, it did not affect the outcome, since Schafer received a jury verdict in his favor on the conversion and breach of fiduciary duty claims. See, *e.g.*, *Fada v. Info. Sys. & Networks Corp.* (1994), 98 Ohio App.3d 785, 792, 649 N.E.2d 904, 908–909.

By the same token, the fact that some evidence about loan offers was proper does not mean that an instruction on mitigation of damages should have been given. As a preliminary point, we find that defendants waived this argument. Specifically, failure to mitigate damages is an affirmative defense. See, *e.g.*, *Young v. Frank's Nursery & Crafts, Inc.* (1991), 58 Ohio St.3d 242, 244, 569 N.E.2d 1034, 1036–1037; *Hines v. Riley* (1998), 129 Ohio App.3d 379, 383, 717

N.E.2d 1133, 1135–1136; and *State ex rel. Martin v. Columbus Dept. of Health* (1979), 58 Ohio St.2d 261, 262, 12 O.O.3d 268, 268, 389 N.E.2d 1123, 1124. Affirmative defenses are waived if not asserted "by motion before pleading, affirmatively in a responsive pleading under Civ.R. 8(C), or through amendment under Civ.R. 15." *Dayton Monetary Assoc. v. Becker* (1998), 126 Ohio App.3d 527, 538, 710 N.E.2d 1151, 1159. In this regard, we note that defendants did not raise mitigation as a defense in their answers, by motion before pleading, or by amendment under Civ.R. 15. Moreover, the instruction defendants offered clearly uses mitigation as an affirmative defense, since the instruction gives Schafer the burden of proving that he could reasonably have avoided his damages. Accordingly, the trial court properly refused the instruction and interrogatories on mitigation of damages.

As an additional point, we agree with the trial court that mitigation was not an issue. While courts must give requested special instructions that are pertinent to an issue and correctly state the law, they have no corresponding obligation to give irrelevant instructions. *Briere v. Lathrop Co.* (1970), 22 Ohio St.2d 166, 176, 51 O.O.2d 232, 237–238, 258 N.E.2d 597, 604. Therefore, even if mitigation had been properly raised, the trial court did not err in refusing to tell the jury that Schafer had to mitigate his damages.

Mitigation of damages (or avoidable consequences) means that " 'one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure *after* the commission of the tort.' " (Emphasis added.) *Johnson v. Univ. Hosp. of Cleveland* (1989), 44 Ohio St.3d 49, 57, 540 N.E.2d 1370, 1377, quoting 4 Restatement of the Law 2d, Torts (1979) 500, Section 918(1). Thus, mitigation refers to actions taken after the commission of a tort, by which a party reduces the damages flowing from the tort. For example, in *Johnson*, the tort was the failure to properly sterilize a mother, and the mitigating action would have been to abort the unwanted child or give the child up for adoption. This would have allowed the parents to "mitigate" or avoid a large percentage of their claimed damages. However, the court rejected mitigation in *Johnson* because it would not be reasonable to make a mother undergo an abortion or put a child up for adoption in order to recover damages for a negligently performed sterilization.

In the present case, mitigation might have been an appropriate issue (if properly raised), as to alleged actions Schafer could have taken to mitigate damages after May 3, 1995 (the date the alleged tort was complete). However, no such theory or evidence was presented. Instead, the pertinent issue really was whether Schafer's alleged damages were proximately caused by the actions of the defendants. Defendants did raise this issue in their answers, and the trial court instructed the jury on proximate cause. The court also gave the jury

interrogatories that required the jury to specifically find (1) if the conversion proximately caused damage to Schafer and (2) if the answer to the first interrogatory was yes, what damages were proximately caused by the conversion. As a result, we believe that the trial court gave the jury instructions that were pertinent to the facts and theories of this case.

In light of the preceding analysis, individual defendants' assignment of error "J" and Schafer's cross-assignment of error (A)(6) are overruled.

### VI. The Magistrate's Decision on Accounting and Prejudgment Interest

At this point, we have overruled all of the defendants' assignments of error, meaning that the judgment of the trial court is affirmed. Normally, this would moot the five cross-assignments of error which remain. However, the majority of the cross-assignments of error must still be addressed, since they relate to post-trial proceedings. We do note that assignment of error (A)(5) raises the propriety of the trial court's grant of summary judgment on Schafer's fraud claim. Because Schafer has not suggested how he would be prejudiced by the summary judgment decision if the jury verdict is affirmed, we find the fraud issue, (A)(5), moot.

The remaining cross-assignments of error deal with a magistrate's decision issued after the trial. As we mentioned earlier, the jury found that RMS and the individual defendants breached their fiduciary duty to Schafer and that Schafer was entitled to an accounting. Following the jury verdict, Schafer filed a motion for prejudgment interest (R.C. 1343.03), a motion for authority to wind up the partnership (R.C. 1775.36), and a motion for dissolution (R.C. 1775.31). After holding hearings on prejudgment interest, dissolution, and accounting, the magistrate issued a decision on November 20, 1998, denying prejudgment interest, the motion for dissolution, and the "motion" for accounting. Schafer then filed timely objections to the magistrate's decision. No other party filed any objections. Ultimately, on February 5, 1999, the trial court rejected the objections and adopted the magistrate's decision. This cross-appeal then followed.

### A. Judgment on the accounting claim

Cross-assignment of error 1(A) deals with the trial court's failure to enter a concurrent judgment on the accounting claim. In this regard, the magistrate found that an accounting for the breach of fiduciary duty was unnecessary since Schafer was made whole by the jury award and was not entitled to additional monetary relief. In contesting this decision, Schafer does not claim that he is entitled to more money; instead, his concern is that he will be left without a remedy if the conversion judgment is reversed. To avoid this possibility, Schafer

has asked us to instruct the trial court to enter a concurrent judgment on the accounting claim for $695,400.

"An action for an accounting seeks a determination by a court of what may be due the respective parties as a result of the relationship between them." *Moore v. Sweda* (1985), 27 Ohio App.3d 38, 39, 27 OBR 40, 41, 499 N.E.2d 371, 373. In *Dunn v. Zimmerman* (1993), 69 Ohio St.3d 304, 631 N.E.2d 1040, the Ohio Supreme Court commented that an accounting has been a traditional prerequisite to a legal action between partners. *Id.* at 307–308, 631 N.E.2d at 1042–1044. According to the court, the reason for this rule was that "until a full accounting had been done, it was impossible to tell, based on the entire scope of partnership transactions, who owed what to whom." *Id.* at 308, 631 N.E.2d at 1043. The court also noted that exceptions to the traditional rule applied, where a formal accounting would be pointless. *Id.* at 309, 631 N.E.2d at 1044. We applied such an exception when we decided that the trial court properly submitted Schafer's conversion claim for damages to the jury. In particular, we focused on the fact that the dispute was limited both in time and number of transactions, *i.e.*, no searching inquiry into partnership affairs was required.

In this regard, the present case is unlike *Dunn*, in which the plaintiff contended that " 'the amount of money due * * * [could not] be ascertained without an accounting showing all receipts received.' " 69 Ohio St.3d at 309, 631 N.E.2d at 1044. Specifically, this case has never been about misuse of or failure to account for partnership receipts over the course of the partnership. Instead, Schafer's claims focused on one discrete transaction—the Sun deal. Indeed, as we mentioned earlier, the amount of damages was not even disputed at trial. Accordingly, under the circumstances of this case, the trial court could properly have allowed the jury to consider damages in connection with both the fiduciary duty and the conversion claims. Specifically, the conversion and breach-of-fiduciary-duty claims were intertwined and we have seen no evidence, from either the trial or the post-trial proceedings, of damages which are unique to one claim as opposed to the other.

In *Dunn*, the court said that:

"A party seeking an accounting must introduce sufficient evidence to enable the court to make a definitive accounting that states the ' "true condition of [the] affairs" ' between the partners. * * * In the absence of sufficient proof, the court must leave the parties where they stand. * * * Once the accounting has been conducted, the trial court may enforce the collection of any amounts found owing." *Id.* at 307, 631 N.E.2d at 1043.

In denying an accounting, the magistrate did not find that Schafer introduced insufficient evidence to allow a definitive accounting. Instead, she found that an accounting was unnecessary, since Schafer had been made whole by the jury

award. She further concluded that ordering an accounting would allow re-litigation of the damages issue. The trial court agreed with this reasoning and overruled Schafer's objections.

Accounting issues and the award of damages that may appear to be necessary fall within the sound discretion of the trial court. As a result, our review is for abuse of discretion. *Sandusky Properties v. Aveni* (1984), 15 Ohio St.3d 273, 274–275, 15 OBR 408, 408–410, 473 N.E.2d 798, 799–801. This means we will affirm unless we find the trial court's attitude "unreasonable, arbitrary or unconscionable." *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601. Decisions are unreasonable if they are not supported by a sound reasoning process. *Id.*

Having reviewed the transcripts of all proceedings, we find no abuse of discretion, except with respect to one point. We agree with the magistrate and the trial court that the *amount* of Schafer's damages was encompassed by the *amount* of the jury award. However, we disagree with the conclusion that an accounting judgment was unnecessary. In this regard, the magistrate observed:

"Plaintiff has been made whole by the jury award and he is not entitled to additional relief.

"The judgment entry journalizing the jury verdict already specifically orders defendants to pay to Plaintiff Everett Schafer $695,400 as direct and proximate damages resulting from the loss of his 19% interest in the partnership. To order an accounting at this time would, in effect, allow the issue of damages to be relitigated. Therefore, based upon all of the evidence, the Court finds that an accounting to determine whether Plaintiff is entitled to additional damages is unnecessary."

Unfortunately, in reaching these conclusions, the magistrate failed to recognize that the damages verdict did not encompass all defendants. Instead, the $695,400 judgment was for conversion and was only against the individual defendants. As Schafer points out, if that judgment is reversed, he will be left without a remedy for the breaches of fiduciary duty that occurred. In our opinion, this makes the magistrate's decision clearly inequitable—or in other words, not supported by a sound reasoning process. Specifically, the jury obviously believed that wrongful conduct occurred. And, as we pointed out earlier, we think the breach-of-fiduciary-duty and conversion claims, including the damages flowing therefrom, are inseparable.

At present, this is a moot point, since we have affirmed the judgment. However, further appeal is possible. Accordingly, we believe cross-assignment of error (A)(1) has merit and that the magistrate did err in its treatment of the

accounting process. By the same token, this error is harmless unless the conversion judgment is reversed on further appeal.

Based on the above discussion, cross-assignment of error (A)(1) is overruled, as it is presently moot. In the event that Schafer's conversion judgment is reversed on further appeal, this case should be remanded to the trial court for an accounting.

### B. Claims for Attorney Fees and Punitive Damages Arising from Breaches of Fiduciary Duty

In cross-assignment of error (A)(2), Schafer claims that he was entitled to a hearing on punitive damages and attorney fees in connection with the accounting. Defendants correctly point out that the trial court's ruling on punitive damages took place during the jury trial, not during the post-trial accounting phase. However, this fact does not preclude Schafer's argument.

Our review of the transcript indicates that the trial judge's position throughout the trial was that punitive damages were not recoverable in connection with a breach of fiduciary duty claim. In fact, the judge explicitly said that Schafer would not be able to recover punitive damages for breach of fiduciary duty at *any* stage of the trial process, *i.e.*, during the jury trial or in a future accounting. The trial judge was quite clear in his position and rejected Schafer's position at least twice during the jury trial. Under the circumstances, Schafer did not have to keep asserting a claim that had already been emphatically rejected. We do note that the jury was allowed to consider punitive damages and attorney fees in connection with the conversion claim, and rejected those claims.

We think the judge erred by rejecting punitive damages *per se*. In *Dunn*, the Ohio Supreme Court approved actions between partners for breach of fiduciary duty and commented that an accounting would be the usual remedy. The court then specifically stated that "[o]nce the accounting has been conducted, the trial court may enforce the collection of any amounts found owing. The trial court's award may include punitive damages in the appropriate circumstances." 69 Ohio St.3d at 307, 631 N.E.2d at 1043, citing *Digital & Analog Design Corp. v. N. Supply Co.* (1989), 44 Ohio St.3d 36, 540 N.E.2d 1358.

The trial judge was aware of the *Dunn* decision but believed *Dunn* had misapplied *Digital & Analog Design.* In particular, the trial judge focused on the fact that *Digital* involved conversion, not breach of fiduciary duty. For some reason, the judge then decided that *Digital* confirmed his position that Schafer could recover punitive damages for conversion, but not for breach of fiduciary duty.

We disagree with the trial judge. First of all, *Digital* did not involve just a conversion claim. Instead, *Digital* involved several intentional torts, including

conversion, trespass, and tortious interference with business relations, as well as claims for breach of contract. 44 Ohio St.3d at 39, 540 N.E.2d at 1361–1362. Second, in *Dunn,* the Supreme Court cited *Digital* as authority for the statement that punitive damages may be awarded in appropriate circumstances. These circumstances, according to *Digital,* were as follows:

"Our prior cases have identified two general categories of conduct by which malice may be shown, either actual or by inference. * * * [P]unitive damages may be awarded upon proof of conduct '(1) * * * characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" *Digital,* 44 Ohio St.3d at 44, 540 N.E.2d at 1365.

Therefore, we interpret *Dunn* to mean that punitive damages can be awarded for breach of fiduciary duty, just like other intentional torts, upon proof of actual or implied malice.

However, while the trial court erred in refusing to allow punitive damages to be considered for the claim for breach of fiduciary duty, we think the error was harmless. As we have stressed, the conversion and breach of fiduciary duty claims were intertwined. Furthermore, although more than one tort was alleged, there is no evidence of a separate animus for any of the acts. In such circumstances, the Ohio Supreme Court has said that parties "should not * * * be punished repeatedly for the same act." *Digital,* 44 Ohio St.3d at 45, 540 N.E.2d at 1366.

In *Digital,* the jury awarded punitive damages in excess of the amount requested in the complaint. As a result, the Ohio Supreme Court had to decide if the award could be sustained based on the existence of multiple tort claims. In this context, the court said:

"[W]hen it is shown that a course of events is governed by a single animus, even though a defendant may be liable to compensate plaintiff for the damages occasioned by a number of torts committed in such course of events, defendants may only be punished once by a single award of punitive damages. Recoveries for multiple claims for punitive damages, contained within separately pleaded tort theories, may not be combined, or stacked, when such multiple tort claims arise from the same animus." 44 Ohio St.3d at 45, 540 N.E.2d at 1366.

Under this holding, Schafer would have been entitled to only one recovery for punitive damages, regardless of the number of tort claims presented. Since the jury considered and rejected Schafer's claim for punitive damages in connection with the conversion claim, any error in failing to submit the issue in the accounting phase was harmless. Accordingly, cross-assignment of error (A)(2) is without merit and is overruled.

### C. Dissolution of RMS

In cross-assignment of error (A)(3), Schafer claims the trial court erred in failing to order the dissolution of RMS. According to Schafer, dissolution was required under each of three independent subsections of R.C. 1775.31. This statute says:

"On application by or for a partner the court shall decree a dissolution whenever:

"* * *

"(3) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business;

"(4) A partner willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him; [or]

"* * *

"(6) Other circumstances render a dissolution equitable."

The magistrate found the evidence insufficient to support dissolution under any of the above factors, and the trial court agreed. Our own review of the evidence reveals no error.

First, concerning R.C. 1775.31(A)(3), the magistrate noted the jury finding of breach of fiduciary duty. However, the magistrate felt this did not necessarily mean that the defendants' conduct prejudicially affected the carrying on of the business. Schafer contests this conclusion by pointing to the various ways in which the defendants violated their fiduciary duties in the financing of the Sun transaction. Assuming this to be the case, however, Schafer has not explained how these acts prejudicially affected the business of the partnership.

Ironically, the partnership has been extremely successful despite litigation, acrimony among partners, and petty behavior on both sides. Partnership assets include the partnership property (valued in the millions of dollars) and long-term leases generating about $559,000 in yearly net income at the time of the dissolution hearing. The partnership has little debt and distributions of the lease income have been consistently made, except when they were intentionally withheld as part of the "squeeze-out." Moreover, as we mentioned above, this case has never been about misapplication or failure to account for partnership funds. Instead, the evidence indicates that the partnership has functioned well, from an income-producing standpoint. Consequently, we agree with the trial court that the wrongful actions and breaches of fiduciary duty by the defendants did not

prejudicially affect the carrying on of the business. Dissolution is, therefore, not required under R.C. 1775.31(A)(3).

Schafer's second argument is that dissolution is required as a matter of law under R.C. 1775.31(A)(4) because the jury found a breach of fiduciary duty. Additionally, Schafer contends that the magistrate erred as a matter of law when she applied the prejudice standard in R.C. 1775.31(A)(3) to the issue of dissolution under R.C. 1775.31(A)(4). Again, we disagree.

R.C. 1775.31(A)(4) contains alternative grounds for dissolution. The first is for willful breaches of the partnership agreement. In this regard, Schafer claims the breaches of fiduciary duty were express violations of the RMS partnership agreement. However, Schafer does not identify any specific provision that was violated, and the agreement itself is largely silent on the issue of fiduciary duties, except for a few vague references. For example, paragraph 16 allows a partner to be expelled for conduct tending to bring the partnership "into disrepute." As defendants have pointed out repeatedly, the agreement itself allowed capital calls, and the majority partners technically did not breach the partnership agreement by voting for cash contributions. Instead, the recovery was based on the majority partners' bad faith in squeezing Schafer out of a lucrative deal and diluting his partnership interest. Consequently, dissolution is not merited under the theory that the defendants willfully breached the partnership agreement.

The second basis for dissolution under R.C. 1775.31(A)(4) occurs where a partner so conducts himself in matters relating to the partnership business that carrying on with him in the partnership is not reasonably practicable. Concerning this point, the magistrate decided that the partners could still carry on business with each other even though Schafer felt the trust relationship among the partners had been destroyed. In particular, the magistrate noted that the partnership continued to thrive despite all that had occurred. We agree with this conclusion.

We also disagree that the magistrate improperly used prejudice in analyzing dissolution under R.C. 1775.31(A)(4). Although the magistrate did not refer to specific statutory subsections during her analysis, her comments are consistent with the contents of each subsection. Moreover, the fact that the magistrate balanced the partnership's financial success against Schafer's belief about lack of trust does not mean that a prejudice standard was applied. Instead, the magistrate was merely observing that the partners could still carry on business with each other. As we said, we agree with that finding.

Finally, with respect to R.C. 1775.31(A)(6), the magistrate weighed various factors and found that dissolution was not equitable. Schafer's argument

in this context is that dissolution is equitable because the defendants can no longer show the "utmost good faith and loyalty" to their minority partner. Without discounting any wrongful acts, we simply do not believe equity weighs in favor of dissolution. In this regard, the magistrate focused on the fact that the conduct alleged by Schafer, even if true, would not justify dissolution unless it prejudicially affected the business.

The statute does not define what is equitable. However, we do not believe the sole focus should be on business success, nor do we think past wrongful behavior absolutely requires dissolution. To the contrary, if either matter controlled, courts would have no reason to consider equity.

The word "equitable" means "just, fair, and right, in consideration of the facts and circumstances of the individual case." Black's Law Dictionary (4 Ed. Rev.1968) 632. Under the circumstances of this case, dissolution is not the right result. First, and most important, it would cause adverse tax consequences and probably a loss of investment value to all partners, including Schafer. Second, at this point, the partnership has almost nothing left to do, other than collect rents and pay the proceeds to the partners. Specifically, all the partnership property has been developed and is the subject of long-term leases. Minimal contact between partners will occur, since only one meeting per year is required. And finally, even during litigation, the partnership was able to make business decisions that were appropriate for the benefit of the business. Accordingly, we agree with the trial court that dissolution is not equitable under R.C. 1775.31(A)(6).

Based on the preceding discussion, assignment of error (A)(3) is overruled.

### D. Prejudgment Interest

The final cross-assignment of error to be discussed is (A)(4), which challenges the trial court's rejection of prejudgment interest. Essentially, prejudgment interest was denied because the magistrate found that both parties failed to cooperate in discovery proceedings. Additionally, the magistrate concluded that both sides "lacked the compromising spirit necessary for effective settlement negotiations." The trial court agreed with these findings.

On appeal, Schafer claims prejudgment interest is required under R.C. 1343.03(C) because the defendants blocked discovery, failed to rationally assess risks and liabilities, and failed to make a good-faith effort to settle. In contrast to Schafer's claims, the individual defendants contend they appropriately conducted discovery, properly analyzed their potential liability, and made a settlement offer. They also add that Schafer did not make a good-faith effort to settle the case.

R.C. 1343.03(C) provides for prejudgment interest if "the court determines * * * that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

In *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, syllabus, the Ohio Supreme Court said that a party does not fail to make a good faith effort to settle when he has "(1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party."

The court also noted that "[i]f a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." *Id.* In a later decision, the court stressed that a failure to make any offer should be strictly construed, to comply with the statutory purpose of encouraging settlement. *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 659, 635 N.E.2d 331, 348.

██ ██ Our review of the trial court's decision on prejudgment interest is confined to deciding whether the court abused its discretion. See, *e.g., Dayton Power & Light Co. v. Chapman* (1993), 89 Ohio App.3d 444, 446, 624 N.E.2d 1079, 1080. As we said earlier, abuse of discretion means that the trial court's attitude was "unreasonable, arbitrary or unconscionable." *AAAA Enterprises, Inc.,* 50 Ohio St.3d at 161, 553 N.E.2d at 601. After examining the record, we see no evidence of such an attitude on the part of the trial court.

The record indicates that Schafer filed five motions to compel discovery from the individual defendants. In turn, the defendants filed two motions to compel discovery from Schafer. Generally, the issues concerned whether distant defendants should have to travel to Ohio for depositions, and whether certain documents were confidential. Ultimately, the parties agreed to depose the defendants by telephone. They also agreed on a protective order, but the court was finally required to rule *in camera* on some documents the defendants objected to producing. Specifically, on May 22, 1997, the court sustained one hundred twelve objections to production and overruled fifty-nine objections. In the decision, the court noted that "[t]his matter came on to be resolved as a result of the continuing inability of counsel for Plaintiffs and counsel for the individual defendants to resolve discovery disputes."

A few days earlier, the court had overruled an RMS motion to vacate the discovery cut-off and trial date. In rejecting the request, the court observed:

"Counsel for the Defendant indicates that the Plaintiffs and the Individual Defendants 'are hopelessly bogged down in discovery.' That is an understate-

ment! This self-inflicted state of events will not be the basis for a continuance. There is universal disagreement among the parties as to who is fair or unfair, diligent or dilatory, reasonable or unreasonable."

Accordingly, the record supports the finding that both sides failed to cooperate in discovery.

The next factor is evaluation of litigation risks and liability. In this regard, Allan Rinzler was the only defendant to testify at the prejudgment interest hearing. At that time, Rinzler testified in detail about his evaluation of litigation risks.

In considering this point, we find it interesting that both sides make inconsistent arguments on appeal when it serves their own advantage to do so. For example, in arguing that the defendants failed to evaluate their risks, Schafer focuses solely on the trial testimony of Brenda Rinzler, who frankly admitted that she paid no attention to any business matters. However, this position is inconsistent with Schafer's claim that Allan Rinzler was properly considered a partner because he acted as a partner and controlled his family's interest. It also ignores Rinzler's testimony at the prejudgment interest hearing.

Likewise, the defendants take inconsistent positions. Specifically, defendants now focus on Allan Rinzler's testimony as proof that they rationally evaluated their risks and liabilities. Apparently, defendants believe that Rinzler can speak for all defendants—or at minimum, that his evaluation is enough to excuse the other parties from the task. Again, this contradicts the defendants' earlier argument that Rinzler was improperly characterized as a "partner" to the jury.

Consistent with our previous findings, we believe Rinzler was authorized to and did speak for the other defendants. As we noted earlier, Rinzler acted as a *de facto* partner, and one could find that he was the prime moving force throughout all the transactions in this case. Consequently, we think Rinzler's risk assessment can be considered on behalf of all defendants. Moreover, while the jury, the trial judge, and now this court have all disagreed with Rinzler's evaluation, that does not mean it was irrational when it was made. See, *e.g., Holman v. Grandview Hosp. & Med. Ctr.* (1987), 37 Ohio App.3d 151, 159, 524 N.E.2d 903, 911–912, and *Walworth v. BP Oil Co.* (1996), 112 Ohio App.3d 340, 354, 678 N.E.2d 959, 969 ("adverse jury verdict standing alone is not proof of irrational evaluation").

Concerning the third prong of "good faith," *i.e.,* delay, the record indicates that defendants did file a number of requests for extension of time and continuances of trial. While the trial process is obviously delayed by continuances and extensions, we find nothing unreasonable about the requests. We note that Schafer has not really addressed this point, other than by generally contending

that the defendants failed to cooperate during discovery. For the reasons mentioned earlier, no one is blameless in that regard.

Finally, with respect to settlement offers, only two were made. First, on May 14, 1997, Schafer offered to settle all claims for payment by defendants of $1,700,000. At the prejudgment interest hearing, Schafer explained that this figure included a buy-out of his twenty-five percent interest. He calculated his total claim to be worth $2,500,000, including the value of the RMS property, the potential value of a settlement with Sun (which was in default at that time), the value of a possible settlement with Malibu, interest on the nineteen percent interest that had been converted, attorney fees, and potential punitive damages.

Counsel for the individual defendants rejected the offer on May 14, 1997, calling it "ludicrous." On June 16, 1997, the individual defendants offered to sell Schafer back the interest he had lost, in exchange for payment by Schafer of $500,000. In the alternative, the individual defendants offered to buy Schafer's remaining interest for the sum of $203,775. Subsequently, on June 19, 1997, Schafer's attorney responded by inquiring about the basis for the buyout figure. However, no reply was received, and neither side made further attempts at negotiating. A short time later, on July 7, 1997, the trial court ruled on the defendants' summary judgment motion, eliminating some of Schafer's claims, but preserving the main thrust of the case. Trial then began on July 14, 1997.

We agree with the trial court that both sides lacked a compromising spirit. As we mentioned before, the amount of Schafer's lost nineteen percent interest, *i.e.*, $695,400, was not really disputed. Despite this fact, Schafer's only offer to settle was for a million dollars more than his claimed damages. By the same token, the defendants' proposal was equivalent to no offer at all. Defendants only offered to let Schafer buy back the nineteen percent interest (meaning that they would pay nothing in settlement of the claims). Their alternative proposal was for Schafer to sell his remaining six percent interest, presumably at the fair market value (or below the fair market value, if one uses the undisputed valuation figures from the trial). Again, this would mean a zero payment by defendants towards any disputed claims.

Although the issue is close on this latter point, we cannot say the trial court abused its discretion in refusing prejudgment interest. While the defendants essentially made no offer, the party seeking prejudgment interest must show both its own "aggressive prejudgment settlement efforts and its adversary's lack of aggressive prejudgment settlement efforts." *Black v. Bell* (1984), 20 Ohio App.3d 84, 88, 20 OBR 105, 108, 484 N.E.2d 739, 743. Since Schafer's own efforts were not aggressive, we cannot completely fault his opponents for failing to respond.

Accordingly, because the trial court did not err in rejecting prejudgment interest, cross-assignment of error (A)(4) is overruled.

### VII. Conclusion

Based on the above discussion, the assignments of error and cross-assignments of error are disposed of as follows:

1. Assignments of error I, II, and III of RMS are overruled;

2. Assignments of error A, B, C, D, E, F, G, H, I, and J of the individual defendants are overruled;

3. Cross-assignment of error A(1) of Everett Schafer has merit, but is overruled as currently moot. In the event that Everett Schafer's conversion judgment is reversed on further appeal, this case should be remanded to the trial court for an accounting.

4. Cross-assignments of error A(2) through A(4) and (A)(6) of Everett Schafer are overruled; and

5. Cross-assignment of error (A)(5) of Everett Schafer is moot.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

GRADY, P.J., and FAIN, J., concur.