OPINION
{¶ 1} Plaintiff-appellant Cincinnati Insurance Company (CIC) appeals from a directed verdict rendered against it on its subrogation claim for damages arising from a fire at the home of its insured. CIC filed suit against Dixon Industries based upon the allegation that a manufacturing defect in the homeowner's riding lawnmower, manufactured by Dixon, caused the fire. CIC contends that it met its burden of producing evidence demonstrating the existence of a manufacturing defect. Thus, CIC claims that the trial court erred in rendering a directed verdict.
 {¶ 2} We conclude that the record before us demonstrates that CIC failed to present evidence from which a reasonable juror could find the existence of a defect, or that the defect existed at the time the mower left the control of Dixon. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 3} CIC instituted suit against Dixon for damages arising from a fire allegedly caused by a mower. The following facts were adduced at trial:
 {¶ 4} Lloyd and Diana Epperly purchased a Dixon riding lawn mower in April of 1997. The mower was used on a regular basis during the summer to mow the Epperlys' yard. It was also used as a snow plow in the winter. The Epperlys never experienced any electrical problems, or any other sort of problem, with the mower. They took the mower to the dealer for regular, routine maintenance.
 {¶ 5} Lloyd Epperly used the Dixon mower to cut his grass on August 1, 2000. After he was finished mowing, he cleaned the mower and stored it in his garage. Mr. Epperly parked the mower between his two vehicles near the doors of the garage. A toy described as a Fisher-Price Power Wheels Jeep was also sitting between the vehicles near the mower.
 {¶ 6} At six o'clock a.m. the next morning, a passerby came to the door of the Epperlys' residence and alerted them that their garage was on fire. The fire department was notified, and the fire was contained. The fire resulted in extensive damage to the garage and its contents.
 {¶ 7} According to Michael Voorhees, Captain of the Buckland Volunteer Fire Department, most of the damage to the garage occurred between the two vehicles in the area where the lawn mower had been located. Voorhees did not recall whether a toy jeep had been situated near the mower.
 {¶ 8} At all relevant times, the Epperlys had in effect a policy of insurance covering their house and garage. The policy was issued by CIC. Rick Spencer was engaged by CIC to investigate the fire. Spencer arrived at the Epperly home around three o'clock p.m. on the day of the fire. At that time, he noted that the mower had already been removed from the garage and that the area inside the garage had been partially swept. He also noted that "there were many pieces of wire around, surrounding this Dixon mower." Spencer collected three "baggies" of items that he thought were related to the mower. However, he was never able to identify the parts as belonging to the mower. The next day Spencer transported the mower and the baggies to a secure facility for storage.
 {¶ 9} Spencer ruled out the Epperlys' vehicles, the garage door opener and two light fixtures as causes of the fire. Spencer opined that, based upon "the physical burn site, the burn patterns that are left after the fire, and [his] training and education," he believed that the fire originated from the mower. Spencer did not mention the toy jeep in his report. However, at trial he testified that he was aware that the toy had been in the garage, and that it had been the subject of a recall because it had caused numerous house fires. Spencer also testified that he was aware that the toy had been used a day or two before the fire.
 {¶ 10} Approximately two years after the fire, CIC hired an electrical engineer, Richard Kovarsky, to determine the cause of the fire. Kovarsky did not visit the Epperly residence. He reviewed the photographs taken by Rick Spencer, and he examined the mower and the contents of the three baggies. Kovarsky did not identify any of the bagged items as having been related to the mower.
 {¶ 11} Kovarsky examined the mower battery and found "no evidence of an electrical fault or short circuit on the battery cable." He also examined a wire that he found on top of the mower. Although Kovarsky was of the opinion that the wire was part of the mower, he could not "trace [the wire] back and absolutely connect it to a wire that was firmly attached to the mower." Kovarsky found "beading" on the wire, but could not tell if the beading caused the fire, or if the beading was caused by the fire. He attributed the fire to a problem with the wire, which he said "most probably shorted out," but he could not provide the "specific mechanism that introduced that problem into the wiring." Kovarsky also admitted that there were other possibilities for the cause of the fire.
 {¶ 12} At the time of his investigation, he was not aware that the toy jeep had been parked in the same area of the garage. Kovarsky admitted that he found evidence of electrical activity on some type of item that was not a part of the Dixon mower. He also was aware that the toy jeep had been recalled for causing fires. However, he did not attribute the Epperly fire to the toy.
 {¶ 13} Following the testimony of these witnesses for CIC, Dixon moved for a directed verdict. This motion was granted, the trial court concluding that the evidence was not sufficient to permit reasonable minds to find that a defect existed when the mower left Dixon's possession. A judgment against CIC on its complaint against Dixon was entered. From this judgment, CIC appeals.
 II {¶ 14} CIC's sole Assignment of Error is as follows:
 {¶ 15} "The trial court erred in granting a directed verdict in favor of defendant/appellee and against appellant/plaintiff on the issue of manufacturing defect."
 {¶ 16} CIC contends that there was ample evidence presented at trial to create a jury issue regarding the existence of, and liability for, a manufacturing defect in the Epperly's mower.
 {¶ 17} We review de novo the trial court's grant of a directed verdict. Schafer v. RMS Realty (2000),138 Ohio App.3d 244,257, citation omitted. Directed verdict motions are governed by Civ.R. 50(A)(4), which provides:
 {¶ 18} "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 19} "The question to be determined involves a test of the legal sufficiency of the evidence to take the case to the jury, and is a question of law, not of fact." Hargrove v. Tanner
(1990), 66 Ohio App.3d 693, 695. Accordingly, the courts are testing the legal sufficiency of the evidence, rather than its weight, or the credibility of the witnesses. Ruta v.Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 67-68.
 {¶ 20} With this standard in mind, we now address CIC's claim that it presented sufficient evidence to support a claim that the Dixon mower had a manufacturing defect.
 {¶ 21} A plaintiff in a product liability claim must prove three things: (1) that there was a defect in the product as it was manufactured and sold; (2) that the defect existed when it left the defendant's hands; and (3) that the defect was the direct and proximate cause of the defendant's injuries and losses. Lonzrick v. Republic Steel, Corp. (1966),6 Ohio St.2d 227.
 {¶ 22} "Product defects may be proven by direct or circumstantial evidence." State Farm Fire Cas. v. ChryslerCorp. (1988), 37 Ohio St.3d 1. "Where direct evidence is unavailable, a defect in a manufactured product existing at the time the product left the manufacturer may be proven by circumstantial evidence where a preponderance of that evidence establishes that the loss was caused by a defect and not other possibilities, although not all other possibilities need be eliminated." Id., citations omitted. "As applied to manufacturing defect cases, evidence of unsafe, unexpected performance of a product, while sufficient to infer the existence of a defect, satisfies but one of the three elements necessary for recovery." Id. "[CIC is] still required to demonstrate by a preponderance of direct or circumstantial evidence that the claimed defect was present when the product left the hands of the manufacturer and proximately caused the claimed injuries." Id.
 {¶ 23} In this case, CIC argues that there is direct evidence of a defect. Specifically, they rely on Kovarsky's testimony regarding the wire found on the mower.
 {¶ 24} In our view, this does not provide direct evidence of a defect. As previously noted, Kovarsky was unable to say with any probability that the wire that he found lying on top of the mower was indeed a Dixon mower part. In fact, there is no evidence in the record to suggest that the wire was on the mower after the fire or to indicate that it was not placed there during the clean-up that occurred prior to Spencer's arrival at the fire scene. Spencer's testimony does not link the wire to the mower. Therefore, regardless of whether the wire showed evidence of a short, it was not sufficiently linked to the mower. Thus, a reasonable juror would be required to speculate concerning the wire's origin.
 {¶ 25} CIC also argues that the testimony of Spencer and Kovarsky — that the burn patterns indicated that the fire started in the vicinity of the mower — provided circumstantial evidence that the mower had a defect, since mowers that are not defective do not normally erupt into flames.
 {¶ 26} This argument also fails. The record demonstrates that Spencer and Kovarsky attributed the fire to the mower primarily because the fire appeared most intense in the area where the mower was located and because it appeared to have traveled from the area where the mower was located toward the back of the garage. This scenario ignores the fact that the evidence in this case suggests another possible source of fire — the toy jeep. In fact, from the record, it appears entirely plausible that the fire started in the jeep and spread to the mower, which, as a result of the gasoline left in the mower, ignited a much larger fire that burned intensely in the area around the mower and spread to the back of the garage.
 {¶ 27} While, as previously stated, it is not necessary to rule out all other possibilities regarding the origin of the fire in order to meet the burden of proof in product liability cases, the fact that there is another plausible source for the fire greatly weakens the inference that the mower must have been defective because its having caught fire would otherwise be inexplicable.
 {¶ 28} We conclude that CIC's evidence is not sufficient to withstand a motion for a directed verdict. On this record, reasonable minds would be required to speculate whether the mower had an electrical defect, and whether that defect caused the Epperly fire. The only basis upon which to find for CIC on this evidence would involve the piling of a number of inferences upon one another. First one must infer that the fire started in the lawnmower (which had never manifested any electrical problems), despite the existence of a competing inference that the fire started in the toy jeep (of a type and model that had been the subject of a recall because of its tendency to spontaneously ignite). Then one must infer that the fire started in the lawnmower as a result of a defect in the lawnmower's electrical system. Finally, one must infer that the defect in the electrical system was present when the lawnmower left the manufacturer. In our view, the cumulation of these inferences is of insufficient probative force to permit a reasonable jury to find, by a preponderance of the evidence, that a defect in the lawnmower at the time the lawnmower left the manufacturer caused the fire in the Epperlys' garage.
 {¶ 29} The sole Assignment of Error is overruled.
 III
CIC's sole Assignment of Error having been overruled, the judgment of the trial court is affirmed.
Grady and Walsh, JJ., concur.
(Judge James E. Walsh of the Twelfth District Court of Appeals, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).